[No. S060500. Mar. 11, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JONATHAN DANIEL D'ARCY, Defendant and Appellant.

## COUNSEL

Jerry D. Whatley, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—A jury found defendant Jonathan Daniel D'Arcy guilty of the first degree murder (Pen. Code, § 187)[1] of Karen Laborde and found true special circumstance allegations that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)) and was committed while defendant was engaged in the commission of mayhem in violation of section 203 (§ 190.2, former subd. (a)(17)(x), now subd. (a)(17)(J)).

The jury deadlocked at the penalty phase, and the trial court declared a mistrial. After retrial of the penalty phase, a different jury returned a verdict of death. The court denied defendant's motion for new trial (§ 1181) and automatic application to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS AND PROCEEDINGS

### A. *Prosecution Guilt Phase Case*

#### 1. *Background*

In 1992, Quintessence, a company located in Tustin, obtained contracts for providing janitorial services to various businesses and then sold the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

contracts to janitors who serviced the contracts as independent contractors. Quintessence collected payment from the businesses and then paid its independent contractors after withholding a management fee. The bookkeeper for Quintessence was victim Karen Laborde.

Defendant purchased several accounts from Quintessence, some of which he financed through the company under terms providing that Quintessence would withhold a portion of future payments made by defendant's customers. He performed janitorial services for his accounts with Jeremy Willis (Jeremy).[2] By about January 1993, defendant had lost all but two of his accounts due to customer dissatisfaction. Still, he owed Quintessence for the purchase fees he had financed for the lost accounts. Matt Conrod, a sales representative with Quintessence, arranged for Quintessence to forgive defendant's debt and maintain his contracts on the two accounts because they were difficult to reassign.

About two weeks before the murder, and after having lost some accounts, defendant had a conversation with Conrod on a second-story balcony at Quintessence. Visibly angry and using "all kinds of foul language," he told Conrod he was "pissed off" at the accounting department. Conrod thought defendant might throw him off the balcony. Defendant warned that "if anything like this happens again, something's going to happen." As he left, he again threatened, "If you don't correct this you better believe me because I'll do something, I'm not kidding."

### 2. The murder of Karen Laborde and defendant's arrest

On February 1, 1993, the day before the murder, defendant, upset and angry, telephoned Conrod at Quintessence to complain he had not been paid for one account. Conrod checked with Laborde on the status of defendant's payment; she told him the check had been taken care of. Conrod then telephoned defendant and told him what Laborde had said. Defendant seemed satisfied with the response. Later that day, defendant telephoned Quintessence and spoke with Eileen Anderson, Laborde's assistant. He was angry and demanded his paycheck. Defendant mistook Anderson for Laborde and threatened to hurt her if he was not paid. Anderson told him, "I'm not Kari [Laborde]. I'm not Kari." She placed defendant on hold, and after speaking with Laborde, informed him that there was no check. Defendant became angry and asked to speak with Conrod.

---

[2] Jeremy was the son of defendant's girlfriend, Joan Willis. After Laborde's murder, Joan remarried and changed her surname to Conners. For clarity, we will refer to her as Joan Willis, or Joan.

Sometime during the same day, defendant spoke with Jeremy about financial problems he faced. He was upset Quintessence had failed to pay him, and told Jeremy that "nobody screws [him]."

On the day of the crime, after defendant and Jeremy had finished the job at defendant's first account, located in Anaheim, defendant told Jeremy, "I quit." With Jeremy in the passenger seat, defendant then drove to Santa Ana, the location of his second account. Defendant, a smoker, had a disposable lighter in his possession that morning.

As they waited for about 10 minutes to be let inside the business, defendant told Jeremy, "No one screws me like that," and said he wanted to get even. Defendant initially said, "I'm not going to kill her. I just want to do it," meaning burn her. Later, he said, "I'm going to kill her." Without servicing the account, defendant left and drove to a gasoline station. At 8:26 a.m., he purchased a dollar's worth of gasoline, dispensing it into a plastic sport bottle. Jeremy asked, "What's that for?" Defendant did not reply and drove to Quintessence. During the drive, Jeremy asked him, "Are you sure you want to do this?" Defendant replied he was "positive." As defendant drove, he appeared calm and relaxed. By the time defendant and Jeremy arrived at Quintessence, defendant had told Jeremy four times that he was going to light her on fire.

When defendant arrived at Quintessence, he gave Jeremy the keys to his truck and told him to "get the hell out of [there]." After entering the building, defendant walked up stairs to the reception area, approached Lisa Chaput, the receptionist, and asked to see Laborde. When Chaput told him she was busy, defendant became angry, saying, "I want to see her and I want to see her now." Chaput walked to Laborde's office and held the door open a few inches. In the next moment, defendant burst through the door, shoving Chaput out of his way. He headed for Laborde, who was sitting behind her desk, and yanked her seat around so that she was facing him. Defendant splashed Laborde's face, arms, and dress with gasoline from the sport bottle and yelled, "This is what you get when you hold my fucking money." Laborde stood up and, wiping her face, asked, "Oh God. Why are you doing this to me?" Defendant stepped closer to Laborde and answered, "This is what you get when you don't give me my money." He then took the sport bottle, poured the remaining gasoline on Laborde's head, and lit her on fire. When Laborde began screaming and struggled to put out the flames that engulfed her, defendant shoved her.

Chaput ran downstairs to warn the building occupants about the fire and encountered defendant as he exited the building. He asked her, "Do you want to fuck with me next?" Defendant asked another woman to light the cigarette in his hand. She refused.

Two brothers, who were detailing a car nearby, and another man learned of the fire. They rushed upstairs and put out the fire with two extinguishers. They discovered Laborde burned on the floor and tried to move her, but could not do so. Tustin Police arrived around 8:39 a.m. and found Laborde on the floor of the office, charred and crying. Most of her clothing had been burned off, and her face and hair were charred. Her mouth and nose were excreting fluids, and skin was hanging from her face.

Chaput saw defendant walk toward a streetlight near the office parking lot, knock on a car, and reach in to light a cigarette. Defendant returned to the curb outside the office building and sat smoking a cigarette until he was arrested minutes later. In a calm voice, he told the arresting officer, "I'm the one you are here to arrest." Defendant was arrested, handcuffed, and placed in a police car. He asked Officer Nasario Solis, an investigator who observed defendant in the police car, how much time he was looking at for attempted murder. When the officer told defendant that he was under arrest for assault, defendant responded, "I don't want assault, I want attempted murder." The officer noticed defendant smelled of gasoline, his hair was singed, and there was soot in his nose.

### 3. The victim's dying declaration and death

Around 9:00 a.m., Laborde was flown to the University of California at Irvine Medical Center. She had suffered third-degree burns on approximately 90 percent of her body. The heat and fumes from the flames had caused severe swelling inside her mouth and the lining of her airways. Laborde's doctor, Daniel Ng, M.D., told her that her injuries were nearly 100 percent likely to be fatal. Laborde declined medical treatment and indicated she wanted only comfort measures including pain medication. She required administration of over 30 milligrams of morphine per hour for over one or two hours to reduce the intensity of her pain and make her comfortable.[3] Laborde died at 4:45 p.m. that day. Laborde's doctor opined that if she had survived, she would have been disfigured and might have lost limbs.

While Laborde was in the hospital, Officer Douglas Finney of the Tustin Police Department asked her how she was injured and recorded her answers.[4] She said that "[Jon D'Arcy] threw this cup of . . . fluid . . . I guess it was gas . . . he threw it all over me and then he lit me" with a "[c]igarette lighter" that he held "in his hand." Laborde stated that defendant "deliberately went

---

[3] According to Laborde's doctor, two to three milligrams of morphine an hour is typically sufficient to cause a person to sleep "a while."

[4] Officer Finney asked Laborde questions and recorded her answers while she was being treated in the emergency room by the trauma team and later, while she was receiving comfort measures in the burn unit.

for me." She said that she was unable to escape because she had no room to move. She had a check for defendant on a desk and would have given it to him had he asked for it. The parties stipulated that, before Laborde was taken from the scene by paramedics, a check made out to defendant for the sum of $159, and dated January 31, 1993, was located on a desk in her office.

### 4. *The fire investigation*

Captain Dennis Shearn, a 10-year veteran with the Orange County Fire Department (OCFD) Investigative Section,[5] investigated the scene immediately after the crime and concluded that an open flame had ignited the fire. Remnants of a plastic bottle that smelled of gasoline were found on the floor near Laborde's desk, and a cigarette lighter was found on another desk in her office. A cigarette lighter has an open flame and could have ignited the fire. Under debris, in the corner of Laborde's office, Shearn discovered a portable space heater with its fan running.[6] He eliminated the space heater and all of the electrical circuit plugs, cords, and appliances in the office as possible sources of the fire.

### 5. *Autopsy*

The autopsy conducted the day after the crime revealed that Laborde had suffered burns on approximately 90 percent of her body. Her hair was singed, and 90 percent of her face, which looked very red, showed loss of skin surface. Her nostrils were blocked by black soot. Her right breast was completely burned off. Laborde's upper respiratory passages, lungs, and stomach were filled with black soot, meaning she had inhaled hot smoke, consistent with a person who was engulfed in flames. The cause of death was asphyxia. The hot smoke Laborde inhaled caused sudden spasms and swelling of her mucosa, causing her to choke to death.

### B. *Defendant's Guilt Phase Case*

Defendant conceded he committed first degree murder and presented evidence that he suffered a mental illness sufficiently severe to create a reasonable doubt regarding the torture and mayhem special circumstances allegations. (§ 190.2, subd. (a)(17)(J), (18).) Supporting testimony came from two forensic psychologists, Edward Fischer, Ph.D., and Veronica Thomas, Ph.D.

---

[5] Captain Shearn had over 25 years experience as a firefighter with the OCFD.

[6] Laborde had placed the space heater between her desk and the desk of her officemate, Anderson. The debris covering the space heater after the fire consisted of pieces of ceiling tile that the firefighters had knocked down in the course of extinguishing the fire.

Around July 1993, at the request of former appointed counsel Jennifer Keller, Dr. Fischer evaluated defendant's mental health. He interviewed defendant, administered several psychological tests, and reviewed historical information contained in defendant's mental health records and obtained by interviews with family members.

Defendant was born in 1962 and raised in a dysfunctional home by his mother. He was first referred for psychological evaluation in kindergarten and second grade, at ages five and eight, respectively. In 1970, clinical psychologist Joan Glad, Ph.D., interviewed and tested defendant and recommended psychotherapy for him and his mother.[7] He received three years of psychotherapy in grammar school. In high school, defendant was placed in special education classes and taught in a building separate from the main high school campus. He received group therapy from a psychiatrist as part of the special education curriculum. When defendant was imprisoned in 1981 for burglary convictions, he was given psychological tests, the results of which were made available to Dr. Fischer. Dr. Fischer also reviewed psychological evaluations of defendant that were performed at Patton State Hospital in approximately September 1993.[8]

In 1996, Dr. Fischer, at counsel's request, reevaluated defendant's mental health, conducted additional structured interviews of defendant, and consulted with Dr. Thomas, who also had administered psychological tests to defendant and formally interviewed him. Dr. Fischer diagnosed defendant with paranoid schizophrenia and suspected he had organic brain damage, but defendant refused to undergo neurological testing. Dr. Fischer opined that defendant experienced an acute psychotic break on the day of the crime due to financial stressors, a loss of self-esteem, feelings of being a failure, and emotional immaturity.

Around July 1996, Dr. Thomas assessed defendant's mental state by conducting an interview and administering various psychological tests. She reviewed historical information from defendant's early childhood and police reports that included statements of Joan and her sons, Jeremy and Corey. Additionally, Dr. Thomas personally interviewed defendant's mother and half sister. She opined that, on the day of the crime, defendant suffered from paranoid disorder that made "it virtually impossible for him to relate to the world around him in a normal fashion." She described defendant's condition as a "delusional disorder of a psychotic nature," meaning defendant had "fixed false beliefs about reality." Dr. Thomas believed there was a possibility defendant had organic brain damage, but her diagnosis was hampered by his

---

[7] Dr. Glad testified for the defense in the penalty phase.

[8] For reasons that are unclear, Dr. Fischer did not provide a formal diagnosis of defendant's mental health in 1993.

refusal to undergo neurological testing. In his paranoid delusion, defendant had strong fixed ideas that the government and his attorney, George Peters, had wronged him. Dr. Thomas did not believe defendant was schizophrenic, however. She acknowledged that defendant's tests showed that he was highly manipulative.

### C. Prosecution Penalty Phase Case

During the penalty phase retrial, the prosecution presented evidence of the crime substantially similar to that presented during the guilt phase. In addition, the following aggravating evidence was presented.

#### 1. Burglary conviction

The prosecution introduced evidence of defendant's prior conviction for burglary on January 9, 1981. (§ 190.3, factor (c).)

#### 2. Prior unadjudicated criminal activity involving force or violence

The prosecution introduced evidence of the following prior unadjudicated criminal offenses involving force or violence under section 190.3, factor (b).

##### a. Assault on Nancy D'Arcy

On September 13, 1985, defendant punched his former wife, Nancy D'Arcy, numerous times in the face, held a knife to her throat, and threatened to cut off her hands and knock out her teeth in order to prevent identification of her body. After the attack, police found Nancy hysterical in the street with a swollen eye and a bloody nose that appeared to have been broken.

##### b. Assaults on Joan Willis

In early 1987, defendant moved in with his girlfriend Joan and her three children, including 18-year-old Jeremy and 20-year-old Corey. He lived with Joan "on and off" for several years. On February 4, 1988, Joan asked defendant to stop yelling during a telephone conversation. He became angry and repeatedly grabbed Joan by her hair and threw her to the floor, pulling out clumps of hair. He punched and kicked holes in two walls in the house.

On August 25, 1988, when defendant told Joan he wanted to use her truck, she was reluctant. He told her, "Get out of my way you f'ing bitch," and then pushed her onto the concrete driveway with such force that she urinated on herself. Joan suffered kidney pain and a scraped elbow.

On September 18, 1989, defendant asked Joan for her bank card in order to purchase alcohol; she refused. He became violent, grabbed and twisted her neck, and tried to choke her. He then pushed her, and she hit her head on a bedpost. Shortly after the incident, she applied for a temporary restraining order, then telephoned defendant from the courthouse to inform him she had filed for the restraining order and to ask him to leave her house. Defendant reacted by spray painting walls in Joan's house, slashing her furniture and clothing, and breaking her furniture. She and her family thereafter lived in a hotel for three months while the house was repaired. After this incident, defendant moved out of Joan's house.

On October 10, 1990, defendant telephoned her several times and threatened to kill her if she did not let him move back into her house. Joan believed his threats and immediately called the police.

### c. *Assaults on Corey Willis and others*

In early April 1991, defendant again was living with Joan and her three children and was working with Thomas Thompson at a telemarketing firm. Defendant was fired because he failed to show up for work on two consecutive days. Defendant blamed Thompson and planned to beat him up. On May 21, 1991, Thompson and Thompson's friend Leonard Godfrey returned with Corey to Joan's house after attending a baseball game. Defendant grabbed an aluminum baseball bat and, standing behind Thompson, hit him on the back of his knees and knocked him into a sofa. Thompson defended himself against defendant's next swing, which glanced off Thompson's hand and forehead. Thompson fled when Joan intervened. Wielding the bat over his head, defendant chased Thompson outside the house and caught up with him when Thompson fell to the ground. Godfrey stepped in front of defendant, who told him to move. Godfrey did not move, and defendant hit him with the bat. After dropping down on one knee, Godfrey stood up. Defendant then hit him with the bat twice in the head and at least 10 times in his sides with sufficient force to knock him off his feet. Godfrey sustained a bloody lip and numerous bruises. During this incident, defendant also threatened to hit Corey with the bat. The victims reported the incident to police, and the investigating officer discovered the bat in a riverbed behind Joan's house.

In mid-1992, defendant choked Terrence Berg with one hand when Berg refused to sell him marijuana.

On January 29, 1993, after an argument with Corey, defendant told Corey to hit him. When Corey refused, he hit Corey across the side of his face. On one occasion before 1990, defendant had put Corey in a headlock.

### 3. *Victim Impact Testimony*

Laborde's mother, Lorene Leiter, testified Laborde was a loving daughter and churchgoer and Lorene missed her. Laborde's twin brother, Darrin Leiter, described Laborde as an easygoing person and an important influence in the family. He experienced a great deal of sadness on his birthday because he had always celebrated the occasion with his sister. Laborde was his best friend, and he missed her.

Laborde's daughter, Rene Granier, testified her mother was murdered shortly before her 16th birthday. She was very close to her mother, shared all of her life experiences with her, and missed her. Rene's life was difficult without her mother's love and support. About eight months after the murder, she moved to Ohio to live with her aunt and attend high school.

Laborde's son, Christopher Granier, testified his mother was a sweet person and he always felt loved and supported by her, even when he misbehaved. After the murder, Christopher joined the Navy. When he served at sea, he often thought about his mother and cried at night.

### D. *Defendant's Penalty Phase Case*

### 1. *Testimony of Joan Willis*

In October 1986, Joan met defendant, and a couple of months later, defendant was hospitalized after a motorcycle accident. Around this time, defendant contacted his estranged father, who wanted nothing to do with him. Defendant took this very hard, and shortly thereafter, sought rehabilitation for heroin abuse. In early 1987, he moved in with Joan and her family.

Defendant frequently had random, violent outbursts towards Joan and others. He could be kind and loving, but also verbally abusive and violent. He was paranoid and sometimes said he was going crazy. Defendant held several jobs over the years but lost each one because he argued with fellow employees and did not take direction very well. He had no friends.

During 1991 and 1992, the family experienced financial pressures. Joan feared she would lose her home because the Social Security benefits two of her children received were going to expire. Joan lent defendant several thousand dollars to purchase the janitorial contracts at Quintessence with the expectation that Jeremy would work with defendant. Defendant quit using alcohol and drugs except marijuana. He attended counseling, read self-help books, attended church, and used other techniques, including drinking chamomile tea, to address his stresses and calm himself.

Defendant began losing his janitorial accounts and became frustrated and depressed. He attempted suicide in front of Joan by superficially slitting his wrists and cutting the skin on his stomach. The day before the murder, defendant was irate because the accounting department at Quintessence did not have a paycheck ready for him. He told Joan he would quit his accounts the following day. Joan called Quintessence but was unable to resolve the problem with defendant's paycheck.

### 2. Defense Attorney Jennifer Keller

Jennifer Keller had represented defendant from April 1993 until February 1994 under court appointment, and she testified regarding an episode in which defendant expressed remorse for the murder.[9] During a meeting with defendant in March or April 1993, Keller showed him newspaper articles about the victim. He became extremely emotional and upset and stated that the victim seemed to be a good person who was loved by many, although he had thought she was horrible and evil. Defendant seemed to have an overwhelming amount of guilt and empathized with Laborde's family. He repeated, "I can't believe I did this. I can't believe I did this." Defendant became distraught and cried intermittently throughout the one-hour meeting. He told Keller he was having nightmares of seeing the victim in flames and wondered whether God would forgive him. Defendant admitted the murder, and Keller explained to him he needed to consider a mental defense. Keller testified defendant's expression of remorse seemed genuine. When she suggested to defendant that he permit mental health experts to examine him and determine what was wrong with him, he appeared to be grateful and willing to cooperate. Defendant admitted there were times when he could not control himself and, although he did not understand this behavior, he wanted to learn what caused it.

Two weeks after this discussion, defendant insisted that he had been framed for the murder and that the space heater spontaneously ignited the fire. Defendant believed Keller, the prosecutor, and the trial judge, among others, were involved in a conspiracy to convict him for a crime he did not commit. He told Keller he was not mentally ill and refused testing. Keller was convinced defendant genuinely believed the thoughts he expressed about the conspiracy. Defendant never again expressed remorse.

### 3. Testimony of psychologists

Dr. Edward Fischer performed psychological evaluations of defendant in 1993 and 1996. In his evaluations, he considered the following information

---

[9] Defendant waived his attorney-client privilege to permit Keller to testify in the second penalty phase.

based on his interview of defendant's half sister, Elizabeth Bartel, and his review of numerous documents obtained by defendant's counsel, including defendant's academic records and mental health records. Defendant and Bartel, who was 11 years his senior, were raised in poverty by their mother, Barbara D'Arcy. During defendant's childhood, his mother suffered from "black moods" that would last for days or weeks. She was not approachable and would not speak to defendant or his half sister while she was in this condition. Defendant's mother often beat him during his childhood, causing bruising on his body. Because she worked the night shift during defendant's early childhood, she tied him in bed during the day so that she could sleep. When defendant was eight years old, defendant's mother forced him to eat his feces because he defecated in his pants on a road trip to Northern California.

Dr. Fischer described defendant's primary diagnosis as paranoid schizophrenia with a learning disability, organic brain dysfunction, and drug and cannabis dependence. His secondary diagnosis was mixed personality disorder including paranoid personality disorder, antisocial personality disorder, and borderline personality. According to Dr. Fischer, defendant's schizophrenia was a severe mental disability that he had had all his life.

Dr. Veronica Thomas evaluated defendant's mental state in October 1996 based on her interview of defendant, psychological tests, review of historical information, and interviews with his mother and half sister. Her review of the information showed that defendant's mother did not deny she tied him down during his early childhood; defendant wet his bed until he was 12 years old; and defendant experienced hallucinations at age 22.

Dr. Thomas explained that bed-wetting is a sign of serious emotional problems and that hallucinations at age 22 "would definitely be associated with a future psychotic diagnosis and/or experience." She diagnosed defendant with a psychotic disorder, delusional disorder, personality impairment disorder, and substance abuse, and attributed the cause of his psychotic disorders to brain dysfunction, genetics, emotional and physical trauma, and child abuse. Dr. Thomas believed that defendant was a sociopath and concluded that he was experiencing a psychotic break when he murdered Laborde.

Dr. Joan Glad testified that in 1970, she was a clinical psychologist with the Orange County Children's Hospital and had interviewed defendant and his mother. She learned then from reviewing historical records that defendant had set a fire on the grounds of his grammar school. Defendant's mother told Dr. Glad that she kept defendant away from other children. Dr. Glad diagnosed defendant with a learning disability and opined that defendant was unhappy, felt helpless, and lacked feelings of power and control. Defendant's

childhood experiences with bed-wetting and fire setting were consistent with his development of severe emotional disturbance later in life. She concluded his mental health was dangerously poor.

### E. Prosecution Rebuttal Evidence

Deputy Christian Dinco, of the Orange County Sheriff's Department, booked defendant into the Orange County jail after the murder. Defendant asked the deputy whether he had seen his case on the news. Defendant remarked that the crime would not have happened if he had been paid, and that he had bills to pay. He admitted he threw gasoline on Laborde and lit her on fire. He said, "Yeah, I just threw a match and she went up like a Christmas tree." Defendant did not appear remorseful.

## II. PRETRIAL ISSUES

### A. Competency to Stand Trial and Right to Self-representation

As set forth more fully below, defendant contends he was denied a meaningful competency hearing under section 1369 because the trial court failed to appoint two experts to evaluate him and failed to obtain a personal waiver of his right to a jury trial. In addition, defendant contends the trial court accepted an invalid waiver of his right to self-representation under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*) and erroneously denied his request for continuance made on the day of trial. The background and procedural history that follow are relevant to our discussion of each of these contentions.

Between April 2, 1993, and February 14, 1994, defendant was represented by appointed counsel Jennifer Keller. During one of their initial meetings at Orange County jail, defendant admitted that he had committed the murder. After hearing his admission, Keller had no doubt that defendant lit Laborde on fire, and "it wasn't a space heater that was responsible." Two weeks after this discussion, defendant changed his story, insisting the space heater spontaneously had ignited the fire and there was a conspiracy to convict him.

On July 30, 1993, in denying defendant's first motion under *Faretta*, the court declared a doubt about defendant's competence to stand trial under section 1368. The court articulated no specific reasons for doubting defendant's competence, but stated it had "a strong feeling that this defendant cannot cooperate with any counsel." Presumably, the court was referring to Keller's representations at the hearing that defendant had organic brain damage that caused him to, among other things, act impulsively and without

reflection and that he was refusing to cooperate with Keller in the preparation of a mental health defense because he did not trust her and believed he was "being framed."

On September 2, 1993, after conducting a competency hearing, the trial court found defendant incompetent to stand trial and committed him to Patton State Hospital. On January 14, 1994, the court received and filed a certificate of restoration under section 1372 and an accompanying report from the medical director of the hospital that indicated defendant's competence had been restored. On February 14, 1994, defendant appeared in court with Keller, who declared a conflict of interest and was relieved as counsel of record. The following day, Paul Stark was appointed counsel of record.[10] On February 22, 1994, the trial court conducted a competency hearing, found defendant competent to stand trial, and reinstated criminal proceedings. (§ 1372.)

On August 12, 1994, the trial court held a hearing on motions that defendant had filed under *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*) and *Faretta*. Defendant told the court that "what happened that day was an accident" and that he wanted to represent himself because his attorneys did not want to pursue an accidental ignition defense.[11] The court then explained to defendant: "But don't you understand that you, as the accused, ultimately does [*sic*] have the right to direct the direction in which your defense goes. The lawyers can advise you, they can tell you what is in your best interest, but when it gets right down to it you make the decision on what kind of defense you offer, and the lawyer either participates with it, or if he has an ethical conflict he can get off the case then." Defendant complained that his prior and present attorneys refused to pursue his defense theory and wanted to take the case in a different "direction." The court denied both of defendant's motions. Defendant filed a petition for writ of mandate in the Court of Appeal, Fourth Appellate District, Division Three, challenging the trial court's rulings.

While writ proceedings were pending, during a discovery hearing held on October 21, 1994, defendant became frustrated when he learned counsel had subpoenaed his jail records and the psychiatric records of two witnesses who sought treatment after the murder. Defendant stated, "It's my wish[] that those records were never subpoenaed. How can [counsel] do that? I thought you told me last time that I was here that I had the final say, that they could only suggest, I had the final say; evidently not." After counsel explained to

---

[10] In late April, the court appointed Ed Hall as second counsel.

[11] Under this theory of defense, defendant acknowledged he poured gasoline on Laborde but denied lighting the gasoline on fire. He insisted the space heater in Laborde's office spontaneously ignited the gasoline fumes.

the court that he had consulted with defendant, defendant added, "I thought you [the court] stated last time that I had the final say; apparently I don't," to which the court replied, "Apparently not."

On January 10, 1995, the Court of Appeal granted defendant's petition and issued a writ of mandate directing the trial court to grant defendant's *Faretta* motion after obtaining a valid waiver of defendant's Sixth Amendment right to counsel. On January 23, 1995, the trial court advised defendant of the dangers and disadvantages of self-representation, obtained a valid waiver of his right to counsel, and granted his *Faretta* motion.

While representing himself, defendant took steps to develop an accidental ignition defense. On May 8, 1995, Robert Lowe of Lowe Fire Investigations agreed to work as a "fire cause and origin consultant" for defendant on a pro bono basis.[12] On July 28, 1995, the prosecutor represented to the trial court that Lowe had examined the space heater recovered from the crime scene. On September 25, 1995, the court granted defendant's request that the prosecutor release crime scene photographs to Lowe. On December 4, 1995, the court appointed Lowe to assist the defense.

On December 8, 1995, the trial court appointed George Peters as advisory and standby counsel.

On April 15, 1996, during a closed proceeding, Peters represented to the trial court that defendant wanted Peters to be his trial attorney and that they had discussed the subject extensively during the preceding week. Defendant told the court that he wanted Peters to present his defense because "it might be a little better than [coming] directly from the horse's mouth." Peters consented to the arrangement but said nothing about presenting defendant's accidental ignition defense. He represented to the court that defendant wanted to retain his in propria persona status in jail and question trial witnesses about his janitorial business practices, if necessary. The court granted defendant's requests and appointed Peters as counsel. It informed defendant that it was "leaving [him] pro per for all purposes at the jail, so far as the jail is concerned you're still pro per; however, [the court] expect[ed] Mr. Peters [to] conduct the voir dire of the jury and . . . [to] be lead counsel and . . . [to] conduct the trial." The court further informed defendant that it would continue to accept motions from him.

The court then told defendant that he was appointing Peters as counsel of record with some reluctance because it questioned whether one of defendant's

---

[12] The source of information regarding Lowe and his fire cause and origin investigation is Lowe's letter dated February 13, 1997, and attached as exhibit I to defendant's in propria persona posttrial motion to dismiss the verdicts, filed March 17, 1997.

prior court-appointed attorneys should be reappointed. Defendant acknowledged he previously had disagreed with his former counsel, Paul Stark and Jennifer Keller, over the theory of the case and explained that, because they believed he set Laborde on fire, they wanted to present a mental defense. Defendant then explained that Peters had interviewed Lowe and reviewed discovery. Defendant told the court, "[Peters] has come to the position, I believe, that he thinks that it's possible [the fire] could have been an accident . . . and it seems that if he's willing to argue that position, as well as some other issues that I brought forth to him, I don't see where there's a conflict. [¶] Again, with Mr. Stark and Ms. Keller, there was a conflict." The court did not respond to defendant's remarks but confirmed Peters's appointment as counsel of record.

On October 25, 1996, at a hearing that had been scheduled to address defendant's *Marsden* and *Faretta* motions filed three days earlier, the trial court addressed instead the issue of defendant's competence based on two letters Peters had received from defense forensic psychologists Drs. Edward Fischer and Veronica Thomas. Dr. Fischer informed Peters that defendant was competent to represent himself at trial but could not cooperate with counsel because counsel was the central object of defendant's paranoia. Dr. Thomas likewise reported to Peters that counsel was the focus of defendant's paranoia, and advised that defendant was incompetent to stand trial. Based on this information, the court appointed psychiatrist Kaushal Sharma, M.D., to examine defendant and report on the issue of his competence. It suspended criminal proceedings and set the matter for a hearing under section 1368.

The hearing took place on November 13, 1996. Peters called Drs. Fischer and Thomas. Dr. Fischer testified that defendant suffered from a paranoid personality disorder and that his mental state fluctuates. Defendant did not trust his attorney and believed Peters was unwilling to present his accidental ignition defense theory. Because of his paranoia, defendant also was convinced there was a government conspiracy against him that included the court system, Peters, other attorneys, and investigators. Defendant's unwillingness to acknowledge his mental problems hindered defense team members' work on his behalf. Dr. Fischer opined that defendant would cooperate only with an attorney who would present his accidental ignition defense theory.

Dr. Thomas testified that defendant suffered from a paranoid disorder and possibly from organic brain damage. In Dr. Thomas's opinion, because defendant was mentally ill and had fixed false beliefs, he was unable to cooperate with counsel.

Dr. Sharma testified that defendant was competent to stand trial. In his opinion, defendant understood the charges against him and knew he faced the

death penalty, but simply refused to cooperate with counsel. In other words, defendant's lack of cooperation with counsel was volitional and not the result of a mental illness.

In ruling that counsel had not sustained his burden, the court found that defendant "is able to understand the nature and purpose in [sic] this proceeding, understand his role in the nature of the proceedings and is able to rationally cooperate with counsel in presenting a defense. He may choose not to cooperate but he is able to cooperate." After a brief recess and private conference with Peters, defendant withdrew his *Faretta* motion, filed October 22, 1996. Defendant agreed to allow Peters to present the defense he believed was appropriate and indicated he would go on a hunger strike. The court accepted the withdrawal of defendant's motion and set trial for November 18, 1996.

On the first day of trial, before the jury selection process commenced, the court conducted a closed proceeding to address defendant's oral complaints about his representation by Peters. Defendant had been on his hunger strike for five days. He complained that Peters had told him he would not present an accidental ignition defense at trial even though Peters had agreed to do so when he was appointed counsel of record on April 15, 1996. Defendant said he needed access to Peters's investigators so he could interview 60 witnesses. He also wanted Peters to provide Dr. Fischer with additional records and reports the psychologist had requested that purportedly would show defendant was experiencing a psychotic episode at the time of the murder and thus did not form the intent to torture. Defendant accused counsel of acting in bad faith, but said he did not believe counsel was incompetent. He felt he had been "tricked" and told the court, "I don't really want to fire Mr. Peters. I think he's competent and he's come this far. What I would like for him to do is finish the work. And if you won't allow more time, I want to . . . get new counsel. But I don't want new counsel. I want to go to trial." The court construed defendant's motion as one for a continuance, denied it as untimely, and terminated his cocounsel status based on his hunger strike, which it deemed "a violation of any counsel's responsibility to the court."

### B. *Asserted Errors in the Competency Hearing*

As noted above, on November 13, 1996, a hearing was held under section 1368 regarding defendant's competence to stand trial. Defendant contends the trial court erred under section 1369 by appointing only one mental health expert to evaluate him for the competency hearing, and by failing to obtain his personal waiver of the right to a jury trial at the hearing. He claims these errors deprived him of due process of law under the Fourteenth Amendment to the federal Constitution. As explained below, each contention lacks merit.

### 1. *Failure to appoint second mental health expert*

Section 1369, subdivision (a) provides in relevant part: "In any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two" mental health experts to evaluate the defendant and render an opinion as to his competence. Defendant asserts the court should have inferred he did not want to be declared incompetent because that finding would have "defeat[ed] his effort to regain sole control of his case" in order to present his accidental ignition defense. The trial court's failure to appoint a second mental health expert to evaluate him, he contends, violated section 1369 and his right to due process under the Fourteenth Amendment to the federal Constitution. The contention lacks merit.

We rejected an almost identical claim in *People v. Lawley* (2002) 27 Cal.4th 102, 132–133 [115 Cal.Rptr.2d 614, 38 P.3d 461]. On appeal, the defendant in *Lawley* argued that, even though neither he nor his counsel expressly informed the judge conducting the competency hearing that he did not seek a finding of incompetence, the judge should have inferred as much based on his insistence on a court trial, new counsel, or, alternatively, the right to proceed in propria persona. (*Id.* at p. 133.) In rejecting the argument, we held that "[s]ection 1369, subdivision (a) plainly requires 'defendant or the defendant's counsel' to 'inform[] the court' that the defense is not seeking a finding of incompetence in order to trigger the required appointment of a second mental health expert." (*Ibid.*) Here, as in *Lawley*, because neither defendant nor counsel expressly informed the court during the competency hearing that defendant was not seeking a finding of incompetence, the trial court was not required to appoint a second mental health expert, and defendant's contention fails.

### 2. *Failure to obtain defendant's personal waiver of his right to a jury trial*

A defendant enjoys a statutory right to a jury trial in a competency proceeding. (*People v. Masterson* (1994) 8 Cal.4th 965, 969 [35 Cal.Rptr.2d 679, 884 P.2d 136]; § 1369.) Defendant contends the trial court was required to obtain his personal waiver of this right because he and Peters were cocounsel under the terms of Peters's appointment on April 15, 1996. He claims the court's failure to obtain his personal waiver deprived him of his right to due process under the Fourteenth Amendment to the federal Constitution. We disagree.

Before addressing defendant's argument directly, it is necessary to clarify the status of defendant's representation. "It is settled that a criminal

defendant does not have a right both to be represented by counsel and to participate in the presentation of his own case. Indeed, such an arrangement is generally undesirable." (*People v. Clark* (1992) 3 Cal.4th 41, 97 [10 Cal.Rptr.2d 554, 833 P.2d 561]; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1368 [65 Cal.Rptr.2d 145, 939 P.2d 259].) "If [a criminal defendant] chooses professional representation, he waives tactical control; *counsel* is at all times in charge of the case and bears the responsibility for providing constitutionally effective assistance. Upon a 'substantial' showing [citation], and entirely subject to counsel's consent . . . , the court *may* nonetheless permit the accused a limited role as cocounsel. *Even so, professional counsel retains complete control over the extent and nature of the defendant's participation, and of all tactical and procedural decisions.*" (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 [259 Cal.Rptr. 701, 774 P.2d 730], original italics.) "[N]one of the 'hybrid' forms of representation, whether labeled 'cocounsel,' 'advisory counsel,' or 'standby counsel,' is in any sense constitutionally guaranteed." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698].)

Here, during the April 15, 1996, closed proceeding, the court approved a form of hybrid representation for defendant in which he was both represented by counsel and permitted to act as cocounsel. Specifically, in granting defendant's request for cocounsel status, the trial court advised defendant that his role would be limited to filing motions and examining witnesses at trial about his janitorial business practices, and that he would retain in propria persona privileges in jail. Peters consented to defendant's cocounsel status and was appointed counsel of record to conduct the trial proceedings.

Turning to the merits, there is nothing in the record that suggests defendant's hybrid representation extended to the November 13, 1996, competency hearing. The reporter's transcript of the competency hearing reflects that only Peters appeared as counsel of record on behalf of defendant. In addition, whereas the minute order for the proceedings held on November 13, 1996, does not indicate defendant's cocounsel status during the competency hearing, it does reflect that defendant and Peters appeared as "cocounsel" in the proceedings that followed this hearing, when criminal proceedings were reinstated.

Further, defendant's conduct during the competency hearing confirms that he *in fact* did not participate as cocounsel. Peters made an opening statement, examined the two defense experts, cross-examined the prosecution's expert, and provided closing remarks. Defendant, on the other hand, did not speak or otherwise participate, with two exceptions. First, defendant acknowledged a greeting by the court when the hearing was called to order. Second, during counsel's examination of Dr. Fischer, defendant attempted to ask the witness

a question. The court interrupted defendant, stating, "We're in a proceeding where you—." Counsel interrupted the court and said, "I'll ask it." Defendant remained silent throughout the rest of the competency hearing. Importantly, defendant never expressly asserted his cocounsel status or participated in the hearing in accordance with the limited cocounsel responsibilities the court had conferred on him in the criminal proceedings. In sum, the record fails to support the factual predicate to defendant's claim: that the hybrid representation extended to the competency hearing. Accordingly, the trial court did not err by accepting Peters's waiver of defendant's statutory right to a jury trial at the competency hearing. (*People v. Masterson, supra,* 8 Cal.4th at p. 974 [counsel may waive a jury trial in a competency proceeding, even over the defendant's objection].)[13]

## C. *Right to Self-representation*

Defendant contends that the trial court violated his rights under *Faretta* by accepting an invalid waiver of his right to self-representation during the proceeding on April 15, 1996. He additionally argues the court erroneously denied his request, made on the day of trial, for a continuance in order to permit Peters to prepare the accidental ignition defense. These errors, he asserts, violated his rights to present a defense and to counsel under the Sixth Amendment and to a reliable penalty determination under the Eighth Amendment. As we explain, each of his contentions lacks merit.

### 1. *Defendant's waiver of his right to self-representation*

Defendant contends his waiver of his previously asserted right to self-representation was invalid on two grounds. First, he argues his waiver was ineffective because it was conditioned on Peters's presentation of the accidental ignition defense and the defense was not presented. Second, defendant maintains his waiver was not valid because it was induced by the trial court's misadvisement on August 12, 1994, that he could decide what defense to present even when represented by counsel. Because he mistakenly believed that Peters would present such a defense and that he, rather than counsel, could choose what defense to present, defendant argues he was unaware of

[13] In light of our conclusion, we need not address the broader question whether a defendant may participate as cocounsel, or represent himself, at a hearing to determine his competency to stand trial under section 1368. (See *People v. Masterson, supra,* 8 Cal.4th at p. 971 ["How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?"]; *People v. Robinson* (2007) 151 Cal.App.4th 606, 616 [60 Cal.Rptr.3d 102] [the trial court erred in failing to appoint counsel to represent the defendant once it declared a doubt about his competency to stand trial under § 1368]; *People v. Tracy* (1970) 12 Cal.App.3d 94, 102–104 [90 Cal.Rptr. 375] [the trial court committed reversible error by permitting the defendant to discharge his attorney and represent himself at a sanity hearing].)

the consequences of his waiver of his *Faretta* right and thus did not knowingly and voluntarily waive his right, requiring reversal of his conviction.

### a. *Asserted conditional waiver*

■ "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." (*Brady v. United States* (1970) 397 U.S. 742, 748 [25 L.Ed.2d 747, 90 S.Ct. 1463]; see *People v. Mroczko* (1983) 35 Cal.3d 86, 110 [197 Cal.Rptr. 52, 672 P.2d 835].) Although we have found no authority directly on point, this court has addressed the related issue of the validity of a conditional waiver of the right to counsel and held that "a waiver of counsel which is made conditional by a defendant cannot be effective unless the condition is accepted by the court." (*People v. Carter* (1967) 66 Cal.2d 666, 670 [58 Cal.Rptr. 614, 427 P.2d 214]; see also *Adams v. Carroll* (9th Cir. 1989) 875 F.2d 1441, 1445 [upholding the defendant's unequivocal request to represent himself if the trial court would not order substitute counsel].)

In *Carter*, on which defendant relies in arguing his waiver of the right to self-representation was invalid, the defendant moved to waive his right to counsel and represent himself at trial. (*People v. Carter, supra*, 66 Cal.2d at p. 668.) With the court's permission, the deputy district attorney undertook the inquiry to determine the defendant's ability to defend himself. During this colloquy, the defendant stated he was willing to represent himself if he were permitted the use of the law library. Later, the defendant refused to defend himself because he had not been provided access to the library; the trial ended in his conviction. (*Id.* at pp. 668–669.) On appeal, this court reversed because there was no constitutionally effective waiver of the defendant's right to counsel. (*Id.* at p. 670.) The record clearly established that the "defendant's willingness to proceed without counsel was predicated upon his mistaken belief, reinforced by the failure of the trial judge to promptly and unequivocally reject the condition imposed by [the] defendant, that he would be permitted some sort of meaningful access to and use of library facilities." (*Ibid.*) This court further noted that the defendant's conduct throughout the trial was consistent with that belief, in that he made multiple requests for access to library facilities in order to prepare his case. (*Id.* at pp. 668–670.)

Here, we need not decide defendant's claim that his waiver of his right to self-representation was invalid because his willingness to waive this right was predicated on his mistaken belief that Peters, by accepting appointment as counsel of record, would present the accidental ignition defense, a belief the trial court reinforced by failing to promptly and unequivocally reject this

condition. Under the unique circumstances presented in this case, even assuming that defendant's waiver was invalid, reversal of his conviction is not required.

■ As defendant acknowledges, a waiver or abandonment of the *Faretta* right to self-representation may be inferred from a defendant's conduct. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 182–183 [79 L.Ed.2d 122, 104 S.Ct. 944]; *People v. Dunkle* (2005) 36 Cal.4th 861, 909–910 [32 Cal.Rptr.3d 23, 116 P.3d 494].) In *McKaskle*, the United States Supreme Court concluded that the self-represented defendant's acquiescence in standby counsel's participation at various points during trial barred his complaint on appeal that counsel's participation infringed on his right to represent himself. (*McKaskle, supra,* 465 U.S. at pp. 182–183.) In *Dunkle*, this court held the trial court erred in denying the defendant's *Faretta* motion made over a year before the commencement of his trial. (*Dunkle, supra,* 36 Cal.4th at p. 909.) Relying in part on *McKaskle,* we concluded that the defendant subsequently abandoned his *Faretta* right when he stated in a later proceeding that he wanted to be represented by counsel, and thus cured any error in the trial court's denial of his *Faretta* request. (*Dunkle,* at pp. 909–910.)

Here, any error by the trial court in accepting a conditional waiver of defendant's right to self-representation during the April 15, 1996, closed proceeding was cured by defendant's conduct during the proceeding held on November 13, 1996, after the court ruled that he was competent to stand trial and reinstated criminal proceedings. There, the court considered the *Faretta* motion defendant had filed on October 22, 1996. A brief recess was taken, and Peters and defendant conferred privately. During this conference, defendant asserts, Peters told him that he did not intend to present the accidental ignition defense.[14] The proceedings resumed, and Peters and defendant again appeared before the court. Defendant withdrew his *Faretta* motion and stated that Peters could present whatever defense he thought appropriate. The record contains no suggestion that defendant did not understand what he was giving up by withdrawing his *Faretta* motion, confirming that he wanted to be represented by Peters, and agreeing that Peters could determine the defense. Hence, we may properly infer that defendant abandoned his *Faretta* right and, in so doing, cured any error by the trial court in accepting his purported conditional waiver of his right to self-representation. (*People v. Dunkle, supra,* 36 Cal.4th at pp. 909–910.)

Finally, without citation to the appellate record, defendant asserts that he had no choice but to withdraw his *Faretta* motion after the conclusion of the competency proceedings on November 13, 1996, because the accidental

---

[14] Defendant repeated the substance of this conversation during the pretrial proceedings held on November 18, 1996.

ignition defense had not been prepared. Keeping Peters as appointed counsel, he reasons, ensured that *a* defense would be presented, even if it was not his preferred defense. But defendant never actually claimed lack of preparation when he withdrew his *Faretta* motion. By as early as July 30, 1993, during the hearing on his first *Faretta* motion, defendant had articulated his accidental ignition defense theory, and he made statements alluding to the theory as late as July 26, 1996, at the hearing on his nonstatutory motion to dismiss. Also, defendant indicated in his posttrial "Motion to Dismiss Verdicts," filed March 17, 1997, that he had begun to utilize Lowe's services around May 1995 and, by April 2, 1996, had learned of Lowe's findings and conclusions.[15] On this record, there is no support for defendant's contention that lack of preparation of his favored defense compelled him to accept appointed counsel.

### b. *Asserted reliance on the trial court's misadvisement*

Defendant claims that, on April 15, 1996, he waived his *Faretta* rights and agreed to Peters's appointment in reliance on the trial court's misadvisement, at the August 12, 1994, hearing on defendant's *Marsden* and *Faretta* motions (see, *ante*, at p. 277), that he could decide what defense theory counsel would present.

▪ That the court misadvised defendant is clear. "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*People v. Welch* (1999) 20 Cal.4th 701, 728 [85 Cal.Rptr.2d 203, 976 P.2d 754], citing *People v. Hamilton, supra,* 48 Cal.3d 1142, 1162.) An exception to this general rule is that defense counsel's traditional authority to control the conduct of the case does not include the authority to withhold the presentation of any defense at the guilt phase if the defendant openly and unequivocally expresses his desire to present a defense and if there exists some credible evidence to support it. (*People v. Burton* (1989) 48 Cal.3d 843, 856 [258 Cal.Rptr. 184, 771 P.2d 1270], citing *People v. Frierson* (1985) 39 Cal.3d 803, 812, 817–818 [218 Cal.Rptr. 73, 705 P.2d 396] (plur. opn. of Kaus, J.).) Counsel, however, is not obligated to present a defense that lacks "credible evidentiary support." (*Burton, supra,* 48 Cal.3d at p. 857.)

Here, defendant fails to show that he actually relied on the court's misadvisement in relinquishing his right to self-representation on April 15, 1996. As recounted above, two months after the court's misadvisement, during a discovery hearing held on October 21, 1994, the court effectively

---

[15] As stated, information regarding Lowe's involvement in defendant's preparation of his defense was contained in exhibit I to defendant's posttrial motion to dismiss the verdicts, filed March 17, 1997. (See, *ante*, fn. 12.)

corrected itself when it agreed with defendant that his appointed counsel could pursue a separate defense strategy, even over defendant's objections. Nothing in the later record contradicts the substance of the October 21, 1994, exchange.

Moreover, even if defendant at some point actually relied on the court's earlier misstatement that he could insist counsel present a particular defense in relinquishing his *Faretta* right, reversal would not be required because, as stated in the preceding part, any error by the trial court in accepting his waiver of his right to self-representation was cured when defendant withdrew his *Faretta* motion during the proceedings that followed the November 13, 1996, competency hearing and stated Peters could determine the defense.

### 2. *Request for continuance*

Defendant argues that, during the November 18, 1996, proceeding immediately preceding commencement of trial, the trial court erroneously denied his request for a continuance to permit Peters additional time to prepare the accidental ignition defense. The claim lacks merit.

Preliminarily, we agree with respondent that defendant continued to enjoy cocounsel status at the November 18, 1996, proceeding.[16] In this capacity, defendant ordinarily would have no authority to request a continuance because, in hybrid types of representation, professional counsel controls the case, including all tactical and procedural decisions. (*People v. Hamilton, supra,* 48 Cal.3d at pp. 1164–1165, fn. 14.) Here, because the trial court permitted defendant to continue to file motions after Peters's appointment, defendant retained some measure of control over procedural decisionmaking in the case. For this reason, we consider his claim on the merits.

■ "A continuance in a criminal trial may only be granted for good cause. (§ 1050, subd. (e).) 'The trial court's denial of a motion for continuance is reviewed for abuse of discretion.' (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) ■ 'There are no

---

[16] Although defendant acknowledges he was cocounsel during the November 18, 1996, proceeding, he insists he also was self-represented until the trial court denied his continuance motion. Defendant is mistaken. When Peters was appointed counsel of record on April 15, 1996, defendant was permitted to assume limited responsibilities as cocounsel, but not to represent himself. Although defendant was permitted to retain his in propria persona privileges at jail, these privileges pertained to only his custody status and had no bearing on his legal representation during the trial proceedings.

In addition, any suggestion by defendant that the trial court improperly revoked his right to self-representation under *Faretta* because he was on a hunger strike is belied by the record. The court revoked defendant's *cocounsel* status because he was involved in a hunger strike, conduct the court viewed as "a violation of any counsel's responsibility to the court."

mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589 [11 L.Ed.2d 921, 84 S.Ct. 841]; see also *Jenkins, supra,* 22 Cal.4th at p. 1039.)" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118 [81 Cal.Rptr.3d 614, 189 P.3d 880].)

Although defendant ostensibly sought a continuance, it is clear from the record that defendant's goal was to obtain a court order that required Peters to complete those tasks that defendant assertedly believed Peters agreed to perform when he was appointed counsel of record on April 15, 1996, but had not finished. For example, defendant wanted his defense to provide the victim's children with an explanation for his conduct on the day of the murder. He also wanted Peters to obtain medical records and reports that Dr. Fischer apparently had requested, and to subpoena additional records, including telephone bills and checks. The court asked defendant, "You're asking counsel to run it [his trial] the way you want it to be run[?] And we are back to this circle[?]" Defendant responded, "It's what he agreed to do and he asked your blessing of the arrangement. . . . It's in the [April 15, 1996] transcript." Thereafter, the court construed defendant's request as one for a continuance to permit Peters additional time to prepare the accidental ignition defense and complete other tasks defendant believed necessary for trial. It told Peters he need not respond to any specific issue and denied defendant's request as untimely.

We conclude the trial court did not abuse its discretion. As stated, immediately before defendant withdrew his *Faretta* motion on November 13, 1996, Peters told him during a private conference that he would not present an accidental ignition defense theory. Defendant thereafter withdrew his *Faretta* motion and agreed that Peters could present whatever defense he thought was "appropriate." Under these circumstances, granting additional time to prepare the accidental ignition defense would have served no purpose. (See *People v. Frye* (1998) 18 Cal.4th 894, 1013 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Further, because jury selection was scheduled to commence the day of defendant's request, it could not be granted without causing a significant disruption in the trial proceedings, and thus was untimely.

### III. GUILT PHASE ISSUES

#### A. *The Victim's Dying Declaration*

Defendant argues that the admission of Laborde's tape-recorded statements to police violated his federal constitutional rights under the United States

Supreme Court's decision in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*).

### 1. *Factual and procedural history*

As stated above in part I.A.3., while Laborde was in the hospital, Officer Finney asked her what happened to her to cause her injuries, and he tape-recorded her answers. Near the beginning of the tape, an unidentified emergency room doctor informed Laborde that her chances of survival were "very poor." She responded by asking, "Am I going to die?" The doctor said, "You're going to die."[17] Laborde told the doctor, "I want to die." She then recounted the facts of the crime and said that defendant threw gasoline on her and lit her on fire with a cigarette lighter.

Subsequently, during the pretrial period when defendant represented himself, he filed a motion for discovery of a *videotape* of Laborde's statements that he believed the prosecution was withholding from him. In this motion, he asserted that the audiotape of these statements, which the prosecution had disclosed to him, had been altered and therefore was untrustworthy. At the December 8, 1995, hearing on the motion, the prosecution informed the trial court that no videotape of Laborde making her statements existed. Thereafter, the court addressed the issue of the reliability of the audiotape and found as follows: "On the issue of reliability, the dying declaration is just that, the victim was apprised of the potential that she was about to die and there appears to be appropriate foundation . . . [for application of the] exception to the hearsay rule."

Defendant acknowledges that he did not object to the admission of the audiotape of Laborde's statements during the guilt or penalty phase.

### 2. *Discussion*

Defendant contends that, even if Laborde's tape-recorded statements were admissible under the dying declaration exception to the hearsay rule,[18] the trial court admitted these statements in violation of his Sixth Amendment

---

[17] The doctor was not identified on the audiotape. Dr. Ng, who treated Laborde after she was transferred to the hospital's burn unit, worked with the trauma team when Officer Finney began to record Laborde's responses. Dr. Ng confirmed that the voice on the tape recording informing Laborde that she was going to die was that of another doctor on the trauma team, but he did not identify the doctor by name.

[18] Under Evidence Code section 1242, "[e]vidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death."

right to confrontation.[19] As a preliminary matter, defendant forfeited this claim by failing to object on this basis at trial. (See *People v. Geier* (2007) 41 Cal.4th 555, 609–611 [61 Cal.Rptr.3d 580, 161 P.3d 104] [the defendant's failure to object forfeited constitutional claims; constitutional claims were not of such magnitude that an exception to the forfeiture rule was warranted].) In any event, defendant's claim is without merit.

■ We begin our analysis with a discussion of the legal principles established in *Crawford*. "*Crawford* . . . held that testimonial out-of-court statements offered against a criminal defendant are rendered inadmissible by the confrontation clause unless the witness is unavailable at trial and the defendant has a prior opportunity for cross-examination. (*Crawford, supra,* 541 U.S. at p. 59.) [¶] Under *Crawford,* the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial." (*People v. Geier, supra,* 41 Cal.4th at p. 597.)

Although the court in *Crawford* did not explicitly define a "testimonial statement," it provided various examples: " ' "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . ." [citation]; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . ." [citation]; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" [citation].' (*Crawford, supra,* 541 U.S. at pp. 51–52.)" (*People v. Geier, supra,* 41 Cal.4th at pp. 597–598.) In addition, the court said certain statements qualify as "testimonial" " 'under any definition—for example, *ex parte* testimony at a preliminary hearing,' [*Crawford,* at p. 52] and 'at a minimum[,] . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.' (*Id.* at p. 68.)" (*Geier,* at p. 598.)

The *Crawford* court clarified that " 'not all hearsay implicates the Sixth Amendment's core concerns,' (*Crawford, supra,* 541 U.S. at p. 51) and . . . acknowledged that certain exceptions to the rule against hearsay in existence

---

[19] Citing *People v. Brown* (2003) 31 Cal.4th 518, 538 [3 Cal.Rptr.3d 145, 73 P.3d 1137], defendant also claims a violation of section 15 of article I of the California Constitution, which independently guarantees the right of confrontation in a criminal prosecution. Defendant makes no credible argument the California constitutional provision should be interpreted differently from the Sixth Amendment.

at the time the confrontation clause was originally adopted fell outside the purview of the clause because 'there is scant evidence that exceptions were invoked to admit testimonial statements against the accused in a criminal case. Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in further-ance of a conspiracy.' (*Id.* at p. 56, italics & fn. omitted.)" (*People v. Geier, supra*, 41 Cal.4th at p. 597.) The high court acknowledged, however, that dying declarations, even those testimonial in nature, were recognized at common law, but left unanswered the question whether the Sixth Amendment incorporates an exception for such declarations. (*Crawford, supra*, 541 U.S. at p. 56, fn. 6.)

We answered this question in *People v. Monterroso* (2004) 34 Cal.4th 743, 764–765 [22 Cal.Rptr.3d 1, 101 P.3d 956] (*Monterroso*), holding, in reliance on *Crawford*'s rationale, that admission of dying declarations, whether or not testimonial in nature, does not violate a defendant's Sixth Amendment right to confrontation. "Dying declarations," we reasoned, "were admissible at common law in felony cases, even when the defendant was not present at the time the statement was taken. (Peake, Evidence (3d ed. 1808) p. 64.) In particular, the common law allowed ' "the declaration of the deceased, after the mortal blow, as to the fact itself, and the party by whom it was committed," ' provided that ' "the deceased at the time of making such declarations was conscious of his danger." ' (*King v. Reason* (K.B. 1722) 16 How. St. Tr. 1, 24–25.) To exclude such evidence as violative of the right to confrontation 'would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught. But dying declarations, made under certain circum-stances, were admissible at common law, and that common law was not repudiated by our constitution in the clause referred to, but adopted and cherished.' (*State v. Houser* (Mo. 1858) 26 Mo. 431, 438; accord, *Mattox v. United States* (1895) 156 U.S. 237, 243–244 [39 L.Ed. 409, 15 S.Ct. 337] ['from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility'].) Thus, if, as *Crawford* teaches, the confrontation clause 'is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding' (*Crawford, supra*, [541 U.S. at p. 54], citing *Houser, supra*, 26 Mo. at pp. 433–435), it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." (*Monterroso, supra*, 34 Cal.4th at pp. 764–765; see also *Giles v. California* (2008) 554 U.S. 353, ___–___ [171 L.Ed.2d 488, 128 S.Ct. 2678, 2682–2683] [testimonial dying declara-tions were admitted at common law even though they were unconfronted].)

Therefore, without considering whether the statements at issue were testimonial in nature, we concluded that admission of statements under the dying declaration hearsay exception does not violate the Sixth Amendment's confrontation clause. (*Monterroso, supra,* 34 Cal.4th at pp. 763, 765, fn. 5.) *Monterroso*'s holding thus disposes of defendant's contention that admission of Laborde's dying declaration violated his Sixth Amendment right to confrontation.[20]

Defendant asserts that *Monterroso* was wrongly decided. The essence of his complaint is that neither the language of the Sixth Amendment nor United States Supreme Court jurisprudence permits an exception to the Sixth Amendment confrontation requirement for dying declarations. That is, defendant disputes *Crawford*'s suggestion that such an exception might exist based on historical grounds (*Crawford, supra,* 541 U.S. at p. 56, fn. 6) because, in his view, dying declarations are inherently unreliable. Defendant, however, does not address the merits of our holding in *Monterroso* nor otherwise provide persuasive reason for us to revisit that decision, and we decline to do so.

### B. *Torture Murder*

The prosecution pursued a first degree murder conviction based on theories of deliberate and premeditated murder, mayhem felony murder, and torture murder. Torture murder is one of the statutorily enumerated types of first degree murder. (§ 189.) In the following discussion, we address in turn defendant's contentions that the standard instruction on torture murder (CALJIC No. 8.24) was unconstitutionally vague and led to arbitrary imposition of the death penalty, that there was insufficient evidence to support his conviction of torture murder, and that the instruction relieved the prosecutor of the requirement to prove the killing of Laborde was deliberate and premeditated murder.

### 1. *CALJIC No. 8.24*

The trial court instructed the jury with CALJIC No. 8.24, which provides in relevant part that first degree murder by torture is perpetrated "with a willful, deliberate, and premeditated intent to inflict *extreme and prolonged pain* upon a living human being for the purpose of revenge, extortion, persuasion or *for any sadistic purpose.*" (Italics added.)

Defendant asserts that the use of the phrases "extreme and prolonged pain" and "any sadistic purpose" in CALJIC No. 8.24 fail to provide the jury

---

[20] Our analysis is unaffected by the high court's decision in *Davis v. Washington* (2006) 547 U.S. 813, 821–822 [165 L.Ed.2d 224, 126 S.Ct. 2266], which clarified what constitutes testimonial hearsay within the meaning of *Crawford.*

with meaningful guidance in determining penalty. As a result, he argues, the instruction is unconstitutionally vague and permits imposition of the death penalty in an arbitrary and capricious manner in violation of the Eighth Amendment. As we explained in *People v. Raley* (1992) 2 Cal.4th 870, 898, footnote 2 [8 Cal.Rptr.2d 678, 830 P.2d 712], however, "[t]he definition of torture murder for the purpose of establishing a first degree murder is irrelevant to the task of defining that narrow class of crimes for which the death penalty is appropriate." Accordingly, we reject out of hand defendant's Eighth Amendment challenge to the first degree murder by torture jury instruction.

### 2. *Sufficiency of evidence*

Defendant argues there was insufficient evidence to support his first degree torture-murder conviction because there was no evidence he formed the intent to inflict extreme and prolonged pain. He contends his conviction on this charge therefore violated his due process rights under the state and federal Constitutions. We disagree.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Valdez* (2004) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296].) . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. (*People v. Ramirez* (2006) 39 Cal.4th 398, 463 [46 Cal.Rptr.3d 677, 139 P.3d 64].) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Valdez, supra*, 32 Cal.4th at p. 104.) A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129 [40 Cal.Rptr.3d 118, 129 P.3d 321].)" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].)

"The elements of torture murder are: (1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." (*People v. Cook* (2006) 39 Cal.4th 566, 602 [47 Cal.Rptr.3d 22, 139 P.3d 492].) "[F]or purposes of proving murder by torture, the intent to inflict extreme pain 'may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.' [Citation.] But

we also have 'cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat of passion, in an "explosion of violence," as with the intent to inflict cruel suffering.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1213–1214 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

Defendant contends the evidence he lit Laborde on fire is inconsistent with an intent to cause prolonged pain. Rather, he argues, Laborde's injuries were consistent with his acting either in rage or with an intent to inflict a quick death and, in any event, resulted from an explosion of anger. Not so.

 Our careful review of the record reveals substantial evidence from which a rational jury could have found beyond a reasonable doubt that Laborde's killing constituted torture murder. The record shows that, for at least two weeks, defendant was angry with Quintessence because he believed the company was withholding his money. He directed his anger specifically at Laborde, the bookkeeper, believing she was personally responsible for withholding his pay. Defendant complained to Conrod and threatened to do "something" if he was not paid. He expressed a desire to get even. On the day of the crime and the preceding day, defendant repeatedly and openly expressed an intent to hurt, burn, and kill Laborde. After pouring gasoline on Laborde's face, arms, dress, and head, and immediately before lighting her on fire, defendant told her, "This is what you get when you don't give me my money." As Laborde tried to put out the flames rapidly engulfing her, defendant shoved her. Such evidence, when considered with the resulting condition of Laborde's body and her death some eight hours later as a result of asphyxia from inhalation of hot smoke, permitted an inference that defendant set Laborde on fire with the intent to inflict extreme pain for the purpose of revenge.[21]

Because we conclude substantial evidence supports a conviction of first degree murder based on a theory of torture murder, we necessarily reject defendant's additional claim that instruction on this theory was not justified by the evidence.

### 3. *Deliberate and premeditated killing and felony murder*

 Defendant contends perfunctorily that the instructions and the prosecutor's arguments were prejudicially erroneous because they relieved the

---

[21] Contrary to defendant's assertion, it is of no legal significance that the two individuals who intervened and extinguished the flames in Laborde's office may have prolonged her life, unwittingly extending her suffering. (See, e.g., *People v. Martinez* (1952) 38 Cal.2d 556, 560–561 [241 P.2d 224] [the jury reasonably found that the defendant, who set his wife on fire, was guilty of torture murder, even though the victim's life had been prolonged by two witnesses who extinguished the flames].)

jury of the necessity of finding that the killing was a deliberate and premeditated murder. He points to no specific language, however, in either the torture-murder instruction or the prosecutor's argument and does not otherwise develop his argument. We thus conclude the issue is not properly raised. (*People v. Lindberg, supra,* 45 Cal.4th at p. 51, fn. 14.) In any event, contrary to defendant's contention, it is well settled that " 'the words "wil[l]ful, deliberate, and premeditated intent to inflict extreme and prolonged pain[]" refer[] only to the requirement that before the trier of fact may convict a defendant of first degree murder by torture there must be found a cold-blooded, calculated intent to inflict such pain for one of the specified purposes. Inasmuch as the Legislature has equated this state of mind with the wil[l]ful, deliberate, premeditated intent to kill that renders other murders sufficiently culpable to be classified as first degree murder, it is unnecessary in torture-murder to also find that the killing itself was "wil[l]ful, deliberate, and premeditated." ' " (*People v. Cole, supra,* 33 Cal.4th at p. 1227, quoting *People v. Wiley* (1976) 18 Cal.3d 162, 173, fn. 4 [133 Cal.Rptr. 135, 554 P.2d 881].)

 Next, defendant argues that the instructions and the prosecutor's arguments were prejudicial because they relieved the jury of the necessity of finding that the felony-murder rule applied. He is mistaken. As stated, torture murder is listed under section 189 as a distinct type of first degree murder. Consequently, the felony-murder rule has no application to a case tried on a theory of first degree torture murder with a torture special circumstance allegation. (See *People v. Mincey* (1992) 2 Cal.4th 408, 451 [6 Cal.Rptr.2d 822, 827 P.2d 388] [trial court erred in instructing on felony murder in torture-murder case].)

### C. *Jury Instructions*

#### 1. *CALJIC No. 2.01*

Defendant argues that the trial court's instruction on the sufficiency of circumstantial evidence to prove a defendant's guilt (CALJIC No. 2.01)[22] impermissibly lessened the prosecution's burden of proof and created an impermissible mandatory presumption of guilt. This court has repeatedly rejected these arguments (see, e.g., *People v. Romero* (2008) 44 Cal.4th 386,

---

[22] CALJIC No. 2.01, as given to the jury, provides in relevant part: "[I]f the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt. If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

415–416 [79 Cal.Rptr.3d 334, 187 P.3d 56]; *People v. Stewart* (2004) 33 Cal.4th 425, 521 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887]), and we do so again here.

### 2. *CALJIC No. 8.81.17*

Defendant argues the trial court erroneously gave the jury an abbreviated version of the mayhem-murder special-circumstance instruction under CALJIC No. 8.81.17, in violation of his rights to a jury trial on the special circumstance and to a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and corresponding state constitutional provisions.

The trial court instructed the jury with CALJIC No. 8.81.17 as follows: "To find that the special circumstance, referred to in these instructions as murder in the commission of mayhem is true, it must be proved: [¶] One, the murder was committed while the defendant was engaged in the commission or attempted commission of a mayhem; and [¶] Two, the defendant had the specific intent to commit mayhem." The instruction omitted the following second paragraph from the instruction: "The murder was committed in order to carry out or advance the commission of the [mayhem] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [mayhem] was merely incidental to the commission of the murder." Defendant asserts that the lack of an instruction requiring the jury to find the murder was committed to facilitate the commission of mayhem reduced the prosecutor's burden of proof and requires reversal.

■ The claim lacks merit. The second paragraph of CALJIC No. 8.81.17 derives from our decision in *People v. Green* (1980) 27 Cal.3d 1, 59–62 [164 Cal.Rptr. 1, 609 P.2d 468], in which we held that the evidence established the defendant committed not " 'a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder.' " (*People v. Valdez, supra*, 32 Cal.4th at p. 113, quoting *People v. Green, supra*, 27 Cal.3d 1, 60.) We have explained that "[t]he second paragraph of CALJIC No. 8.81.17 is appropriate where the evidence suggests the defendant may have intended to murder his victim without having an independent intent to commit the felony that forms the basis of the special circumstance allegation. In other words, if the felony is merely incidental to achieving the murder—the murder being the defendant's primary purpose—then the special circumstance is not present, but if the defendant has an 'independent felonious purpose' (such as burglary or robbery) and commits the murder to advance that independent purpose, the special circumstance is present." (*People v. Navarette* (2003) 30

Cal.4th 458, 505 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; see also *People v. Raley, supra,* 2 Cal.4th at p. 903 ["Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance."].)

"[I]nasmuch as *Green* did not announce a new element of the special circumstance allegation but had merely clarified the scope of an existing element, a trial court had no sua sponte duty to provide a clarifying instruction in the absence of evidence to support a finding that the felony was in fact merely incidental to the murder." (*Monterroso, supra,* 34 Cal.4th at p. 767, citing *People v. Kimble* (1988) 44 Cal.3d 480, 501–503 [244 Cal.Rptr. 148, 749 P.2d 803].) Thus, a trial court has no duty to instruct on the second paragraph of CALJIC No. 8.81.17 unless the evidence supports an inference that the defendant might have intended to murder the victim without having had an independent intent to commit the specified felony. (*Monterroso,* at p. 767.)

Here, the evidence showed that defendant had concurrent intents to maim and murder Laborde. On the day before the murder, he spoke with Laborde's assistant on the phone and demanded his paycheck. Believing her to be Laborde, defendant threatened to "hurt" her if she did not pay him. On the morning of the murder, he told Jeremy he wanted to get even and to light Laborde "on fire." Defendant said, "I want to burn her." He also stated, "I'm not going to kill her. I just want to do it." Later, he told Jeremy he was "going to kill" Laborde. Immediately before opening his container of gasoline and dousing Laborde with the liquid, he yelled, "So you're holding my fucking money, huh? This is what you get when you hold my fucking money." Defendant's statements reveal that, based on a mistaken belief that Laborde had withheld his pay, he intended both to kill her and to cause her extreme pain and disfigurement by burning her.

Moreover, even if there was sufficient evidence to require the trial court to instruct pursuant to the second paragraph of CALJIC No. 8.81.17, any error in failing to instruct would be harmless. During closing argument, defense counsel conceded the crime was first degree murder and presented only a mental defense to the special circumstance allegations. Counsel essentially argued that defendant could not form the requisite mental state of the special circumstances due to his mental illness.[23] The defense made no effort to defend against the mayhem special circumstance allegation on the theory that the maiming of Laborde was merely incidental to achieving the murder. Under these circumstances, the omission of the second paragraph of CALJIC No. 8.81.17 was harmless under any standard.

---

[23] Defendant had been diagnosed by two forensic psychologists with paranoid schizophrenia and paranoid disorder. Other professionals had diagnosed him with antisocial personality disorder.

### D. *Preautopsy Photographs*

During the guilt phase and outside the presence of the jury, the prosecutor proffered five preautopsy photographs depicting Laborde's charred body. Defense counsel objected that the photographs were hideous, unduly prejudicial, and cumulative in light of the emotional testimony that established the extent of Laborde's burns and the nature of her injuries. He asked the trial court to exclude all of the photographs or, in the alternative, limit the number of photographs to one. The prosecutor argued the photographs were relevant to prove defendant's intent to torture and to commit mayhem. The trial court concluded "the probative value [of the photographs] exceed[ed] prejudice to the defense" and ruled the photographs admissible to "show substantial charring in various parts of the body and enormous swelling and disfigurement of the face and [to] demonstrate graphically the ingestion of hot gasses caused by the alleged conduct of the defendant."

During the penalty retrial, the prosecutor moved to introduce the same photographs into evidence as relevant to the issue of punishment. Defense counsel objected, relying on the same grounds he asserted during the guilt phase. The trial court ruled the photographs were admissible for the same reasons it concluded they were admissible in the guilt phase.

On appeal, defendant argues the trial court's ruling constituted an abuse of discretion in that the preautopsy photographs were irrelevant to the determination of guilt and highly prejudicial in their depiction of Laborde's wounds. He contends their admission in the guilt and penalty phases violated his rights to due process, a fair trial, and a reliable determination of guilt beyond a reasonable doubt under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Defendant's contentions lack merit.

██ "The rules governing the admissibility of photographic evidence are settled: all relevant evidence is admissible, unless excluded under the federal or state Constitution or by statute, and trial courts have broad discretion in determining the relevance of evidence . . . ." (*People v. Vieira* (2005) 35 Cal.4th 264, 293 [25 Cal.Rptr.3d 337, 106 P.3d 990].) The court's exercise of that discretion will not be disturbed on appeal unless the prejudicial effect of the evidence clearly outweighs its probative value. (*People v. Martinez* (2003) 31 Cal.4th 673, 692 [3 Cal.Rptr.3d 648, 74 P.3d 748]; see Evid. Code, § 352.) Further, we have emphasized that " 'the trial court's discretion [at the penalty phase] to exclude circumstances-of-the-crime evidence as unduly prejudicial is more circumscribed than at the guilt phase. During the guilt phase, there is a legitimate concern that crime scene photographs . . . can produce a visceral response that unfairly tempts jurors to find the defendant guilty of the charged crimes. *Such concerns are greatly diminished at the penalty phase* because

the defendant has been found guilty of the charged crimes, and the jury's discretion is focused on the circumstances of those crimes solely to determine the defendant's sentence. Indeed, the sentencer is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light.' " (*People v. Moon* (2005) 37 Cal.4th 1, 35 [32 Cal.Rptr.3d 894, 117 P.3d 591], first italics added, quoting *People v. Box* (2000) 23 Cal.4th 1153, 1201 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

We have viewed the photographs and conclude the trial court did not abuse its discretion in admitting them. "Photographs of a murder victim 'are always relevant to prove how the charged crime occurred, and the prosecution is "not obliged to prove these details solely from the testimony of live witnesses," ' even in the absence of a defense challenge to particular aspects of the prosecution's case." (*People v. Vieira, supra,* 35 Cal.4th at p. 293, quoting *People v. Pollock* (2004) 32 Cal.4th 1153, 1170 [13 Cal.Rptr.3d 34, 89 P.3d 353].) "[W]e have often rejected the argument that photographs of a murder victim should be excluded as cumulative to other evidence in the case." (*People v. Cole, supra,* 33 Cal.4th 1158, 1199.) The five photographs depicted numerous burns on various parts of Laborde's body and extensive swelling and disfigurement of her face. Although unpleasant to view, they were relevant to support the prosecution's theories of felony murder in the commission or attempted commission of mayhem, and torture murder. (*Ibid.*) At the penalty phase, the photographs demonstrated graphically the circumstances of the murder (§ 190.3, factor (a)) and therefore were relevant to the penalty determination. (*People v. Moon, supra,* 37 Cal.4th at p. 35; *People v. Raley, supra,* 2 Cal.4th at p. 914.) Accordingly, we reject defendant's claim of error.[24]

### E. *First Degree Murder Liability and Special Circumstance Findings*

Defendant argues that California's death penalty scheme, as applied to his case, violates the double jeopardy clause of the Fifth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment because it permitted the jury to use the circumstances that he committed the murder in the perpetration of mayhem and by torture to support (1) his first degree murder conviction under a felony-murder theory, (2) the mayhem and torture felony-murder special-circumstance findings, and (3) the imposition of a death sentence. As he acknowledges, we have repeatedly rejected this same argument. (See, e.g.,

---

[24] Assuming without deciding that defendant preserved his claims of federal constitutional error despite his failure to timely object on such grounds (*People v. Panah* (2005) 35 Cal.4th 395, 438, fn. 13 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118, 133 [2 Cal.Rptr.3d 186, 72 P.3d 1166]), we reject these claims for the reasons stated.

*People v. Seaton* (2001) 26 Cal.4th 598, 690–691 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Marshall* (1990) 50 Cal.3d 907, 945–946 [269 Cal.Rptr. 269, 790 P.2d 676]; see also *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246 [98 L.Ed.2d 568, 108 S.Ct. 546] ["the fact that the aggravating circumstance duplicated one of the elements of the crime does not make [the death] sentence constitutionally infirm"].) Defendant offers no persuasive reason to revisit our prior decisions, and we decline to do so.

### F. The Three Strikes Law

Defendant argues that the torture and mayhem special circumstance allegations should have been dismissed because the 1993 homicide with which he was charged was subject to the provisions of the "Three Strikes" law (§§ 667, 1170.12), adopted in 1994. He contends the Three Strikes law precludes imposition of a death sentence for defendants, like him, who are convicted of first degree murder with special circumstances and who have suffered one or more prior violent or serious felony convictions. As defendant concedes, we previously have rejected this claim. (See, e.g., *People v. DePriest* (2007) 42 Cal.4th 1, 61 [63 Cal.Rptr.3d 896, 163 P.3d 896]; *People v. Hughes* (2002) 27 Cal.4th 287, 405–406 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Alvarez* (1996) 14 Cal.4th 155, 246–247 [58 Cal.Rptr.2d 385, 926 P.2d 365].) He offers no persuasive reason for this court to reconsider its previous decisions.

### IV. PENALTY PHASE ISSUES

### A. Failure to Instruct Regarding Burden of Proof, Unanimity on Aggravating Factors, and Presumption of Life

Defendant asserts various instructional errors that we have considered and repeatedly rejected in previous decisions. Because he offers no persuasive reasons why we should reconsider our precedents, we reject his challenges.

 There is no constitutional requirement that the trial court instruct the jury that it must find all aggravating factors beyond a reasonable doubt or, at a minimum, by a preponderance of the evidence. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 830 [89 Cal.Rptr.3d 225, 200 P.3d 847]; *People v. Smith* (2007) 40 Cal.4th 483, 526 [54 Cal.Rptr.3d 245, 150 P.3d 1224].) The trial court's failure to instruct the jury on a burden of proof does not violate a defendant's constitutional rights under the Sixth, Eighth, and Fourteenth Amendments. (*People v. Gutierrez, supra,* 45 Cal.4th at pp. 830–831.) The trial court need not instruct the jury that it must unanimously find true any particular aggravating factor. (*Id.* at p. 829.) The United States Supreme Court decisions in *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556,

122 S.Ct. 2428], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), neither affect nor justify reconsideration of the foregoing decisions.

 The federal Constitution does not require that the jury be instructed on a presumption in favor of a sentence of life imprisonment without possibility of parole. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 833; *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

### B. *CALJIC No. 8.85*

Defendant contends that the trial court's instruction under CALJIC No. 8.85, the standard instruction that describes the aggravating and mitigating factors the jury may consider in determining penalty, violated his state and federal constitutional rights in various respects.

Despite defendant's failure to object to this instruction at trial, his claim is cognizable on appeal to the extent it affects his substantial rights. (§ 1259; *People v. Watson* (2008) 43 Cal.4th 652, 701 [76 Cal.Rptr.3d 208, 182 P.3d 543]; see also *People v. Gray* (2005) 37 Cal.4th 168, 235 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

 As defendant acknowledges, this court repeatedly has rejected all of his contentions. Because he offers no compelling reason to reexamine our decisions, we decline to reconsider them here. We thus hold that CALJIC No. 8.85: (1) does not violate a defendant's "state and federal constitutional rights to equal protection and due process because it allows the consideration of unadjudicated criminal conduct in capital sentencing, while such conduct may not be used in sentencing noncapital offenders" (*People v. Watson, supra,* 43 Cal.4th at p. 701); (2) is not constitutionally defective because it lacks instruction regarding the elements of unadjudicated criminal conduct (see *People v. Lewis* (2001) 25 Cal.4th 610, 668 [106 Cal.Rptr.2d 629, 22 P.3d 392]); and (3) "do[es] not violate the Eighth and Fourteenth Amendments by failing to delete inapplicable sentencing factors or delineate between aggravating and mitigating circumstances" (*People v. Ramirez, supra,* 39 Cal.4th 398, 469).

### C. *CALJIC No. 8.87*

The trial court instructed the jury under CALJIC No. 8.87, the standard instruction for considering other criminal activity under factor (b) of section 190.3 (factor (b)), and listed seven assaults and two threatening phone calls

that defendant allegedly had committed.[25] The instruction reminded the jurors that the prosecution must prove the commission of each crime beyond a reasonable doubt before they could consider any of the specified unadjudicated criminal activity as factors in aggravation. Also, the jury was provided with the definition of each alleged crime. Defendant argues this instruction's reference to "criminal acts" involving "the express or implied use of force or violence or the threat of force or violence" unconstitutionally removed from the jury's consideration the issue whether the alleged acts amounted to criminal acts involving an express or implied use of force or violence, or the threat thereof, within the meaning of factor (b), and thereby directed a verdict on an essential element of the factor (b) finding the jury was to determine.

Preliminarily, respondent asserts this issue is forfeited because defendant failed to object at trial. As stated, however, to the extent a claim of instructional error affected a defendant's substantial rights, it is reviewable on appeal despite a failure to object at trial. (*People v. Gray, supra,* 37 Cal.4th at p. 235; § 1259.)

▆▆▆ Nonetheless, as we previously have held, these contentions are without merit. As we stated in *Monterroso, supra,* 34 Cal.4th at page 793, "[t]hese instructions 'properly told the jurors that they could consider any of the specified unadjudicated criminal acts as factors in aggravation only if they found beyond a reasonable doubt that defendant had committed the act or activity, and that it involved the use or attempted use or express or implied threat to use force or violence.' " (*Ibid.,* quoting *People v. Sapp* (2003) 31 Cal.4th 240, 314 [2 Cal.Rptr.3d 554, 73 P.3d 433]; see also *People v. Nakahara* (2003) 30 Cal.4th 705, 719–720 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) Further, "*Apprendi* does not extend to require a jury to find beyond a

---

[25] The trial court instructed the jury based on CALJIC No. 8.87 (1989 rev.) as follows: "Evidence has been introduced for the purpose of showing that the defendant . . . has committed the following criminal acts which involve the express or implied use of force or violence or the threat of force or violence:

"One, an assault and battery on Nancy D'Arcy in Minnesota in September of 1985.

"Two, an assault and battery on Joan Willis on February 4, 1988.

"Three, an assault and battery on August 25, 1988.

"Four, an assault and battery on Joan Willis September 18, 1989.

"Five, two threatening phone calls to Joan Willis on October 10, 1990.

"Six, an assault with a deadly weapon on Thomas Thompson and Leonard Godfrey on May 21, 1991.

"Seven, an assault and battery on Terry Berg in 1992.

"Eight, an assault and battery on Corey Willis on January 29, 1993.

"Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant[] . . . did in fact commit such criminal acts. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance other than the above crimes under Factor B and the crime of which the defendant was convicted in the present proceeding under Factor A . . . ."

reasonable doubt the applicability of a specific section 190.3 sentencing factor." (*People v. Ochoa* (2001) 26 Cal.4th 398, 453 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

### D. *CALJIC No. 8.88*

Defendant contends the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and corresponding provisions of the California Constitution, by instructing the jury with CALJIC No. 8.88.[26]

Even though defendant failed to challenge this instruction at trial, his claim is properly before us to the extent the asserted instructional errors affected his substantial rights. (§ 1259; *People v. Watson, supra,* 43 Cal.4th at p. 701; see *People v. Gray, supra,* 37 Cal.4th at p. 235.) We therefore address defendant's claim on the merits.

As defendant concedes, in prior cases we consistently have considered and rejected each of his arguments. Because he offers no persuasive reason why we should reexamine our prior decisions, we reject his challenges. We thus hold that CALJIC No. 8.88: (1) is not unconstitutionally vague and does not impermissibly reduce the burden of proof necessary to impose the death penalty by using the "so substantial" standard for comparing mitigating and aggravating circumstances (*People v. Gutierrez, supra,* 45 Cal.4th at pp. 832–833; *People v. Wilson* (2008) 43 Cal.4th 1, 31 [73 Cal.Rptr.3d 620, 178 P.3d 1113]); (2) properly explains the weighing process

---

[26] The trial court instructed the jury with CALJIC No. 8.88, in relevant part, as follows: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances, that it warrants death instead of life without parole."

that a jury is required to perform (*People v. Gutierrez, supra,* 45 Cal.4th at p. 833); (3) properly cautions against a " ' "mere mechanical counting of factors" ' " (*People v. Vieira, supra,* 35 Cal.4th at p. 300, italics omitted); (4) is not defectively "death-oriented" because it fails to define or describe the penalty of life without the possibility of parole (*People v. Gutierrez, supra,* 45 Cal.4th at p. 833); (5) is not unconstitutional because it fails to instruct the jury that a single mitigating factor could outweigh multiple aggravating factors and by itself could justify a verdict of life imprisonment without the possibility of parole (*People v. Salcido* (2008) 44 Cal.4th 93, 162–163 [79 Cal.Rptr.3d 54, 186 P.3d 437]); and (6) adequately defines mitigation (*People v. Welch, supra,* 20 Cal.4th 701, 772–773).

### E. *Asserted Error in Failing to Define the Special Circumstances*

Defendant argues that the trial court's failure to define for the penalty phase retrial jury the term "special circumstance," to instruct that the special circumstances were "torture" and "mayhem," and to define the terms "torture" and "mayhem" led the jury to believe it could "double count" the special circumstances under section 190.3, factor (a) (factor (a)) in violation of his rights to due process of law, a nonarbitrary and reliable penalty determination, and equal protection under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution. As we conclude below, the trial court did not err in instructing the penalty retrial jury regarding its consideration of evidence under factor (a).

#### 1. *Background*

The trial court instructed the penalty retrial jury under CALJIC No. 8.84 that defendant had been found guilty of first degree murder and the allegation that the murder was committed under one or more special circumstances had been found true. It then explained under this instruction that "the penalty for a defendant found guilty of murder of the first degree [is] [either] death or confinement in the state prison for life imprisonment without the possibility of parole in any case in which the special circumstances alleged in this case have been specially found to be true." Thereafter, the trial court instructed the jury with CALJIC No. 8.85, tracking the language of section 190.3, that, in determining penalty, it could consider under factor (a) "the circumstances of the murder of which the defendant was convicted and the existence of any special circumstances found to be true." The court neither identified nor defined the special circumstances. During voir dire, however, the trial court had told the jury that defendant "has been convicted not only of first degree murder, that is, premeditated, deliberate[] killing, but he's also been convicted of murder by torture and mayhem." Also, the prosecutor had informed the jury during his opening statement that defendant had been "convicted of first degree murder and special circumstances of torture and mayhem."

## 2. *Discussion*

Defendant contends that the language of CALJIC No. 8.85, instructing the jury to consider "the circumstances of the murder of which the defendant was convicted and the existence of any special circumstances found to be true" under factor (a), misled the second penalty jury to believe it could double count the torture and mayhem special circumstances as "the circumstances of the crime" *and* "the special circumstances found to be true." He further asserts that this instructional error was compounded by the trial court's failure to provide the jury definitions of the torture and mayhem special circumstances.

Even though defendant failed to challenge this instruction at trial, his claim is cognizable on appeal to the extent the asserted instructional errors affected his substantial rights. (§ 1259; *People v. Watson, supra,* 43 Cal.4th at p. 701.) We therefore consider defendant's claim on the merits.

This court "already ha[s] determined that CALJIC No. 8.85 does not imply that the jury may 'double count' evidence." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 671 [21 Cal.Rptr.3d 612, 101 P.3d 509].) Moreover, we have repeatedly rejected claims that "the court was obliged, on its own motion, to instruct the jury not to 'double count' the same facts as circumstances of the crime and as special circumstances" "where the defense did not request an instruction against double counting, and there was no misleading argument by the prosecutor suggesting the same facts should be weighed twice, once under each rubric." (*People v. Cain* (1995) 10 Cal.4th 1, 68 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

Here, defendant's claim, at bottom, is substantively no different than that presented by the defendant in *People v. Murtishaw* (1989) 48 Cal.3d 1001, 1019 [258 Cal.Rptr. 821, 773 P.2d 172], in which we rejected a claim of instructional error during a penalty retrial involving a nearly identical instruction regarding factor (a) and a multiple-murder special-circumstance finding. On appeal, the defendant argued that, because the trial court did not fully define the special circumstance, the jury could have believed the special circumstance was a separate aggravating factor in addition to the circumstances of the crime under factor (a). Alternatively, the defendant contended the jury could have understood the instruction to permit double counting the multiple-murder special circumstance as both a special circumstance finding and a circumstance of the crime under factor (a). In rejecting these arguments, we concluded the jury reasonably would have understood that the multiple-murder special-circumstance finding made the defendant eligible for the death penalty, and the facts supporting the special circumstance were

relevant to its determination of the appropriate penalty. (*Murtishaw*, at p. 1019; see also *People v. Keenan* (1988) 46 Cal.3d 478, 520 [250 Cal.Rptr. 550, 758 P.2d 1081].)

We find no merit to defendant's additional claim that, during penalty phase argument, the prosecutor improperly described Laborde's murder as a "purposeful and calculated killing" that was committed with "brutality" and emphasized that defendant had numerous opportunities to abandon his plan to kill Laborde (e.g., when he first poured gasoline on her, when he ignited the gasoline, and when he poured the remaining gasoline on her), because these facts also arguably supported the special circumstances. Our review of the record reveals that each of the prosecutor's references to factor (a) evidence during argument comported with the law. The prosecutor properly explained to the jury that factor (a) concerned "[t]he circumstances of the crime . . . we are talking about the crime, the murder of Kar[e]n Laborde, and the existence of any special circumstances. [¶] . . . the entire circumstances of the crime, including how horrible it was, how atrocious it was, and the impact it had on the eyewitnesses." Ultimately, he argued death was warranted because "[t]he circumstances of the death of Kar[e]n Laborde under factor (a) are so cruel, so vicious, so intentional, that there is nothing in the world that can possibly mitigate it. Not his mental disorder. . . . Not his upbringing." The prosecutor's argument, therefore, did not mislead the jury into thinking that it should double count the special circumstances.

### F. *Jury Instruction Regarding Defendant's Oral Statements*

During the penalty retrial, the trial court instructed the jury under CALJIC No. 8.85 that, in deciding penalty, it could consider, among other factors, evidence of the circumstances of the murder under factor (a) and unadjudicated criminal activity alleged under factor (b). The jury also was instructed under CALJIC No. 2.71 that it should view with caution evidence of defendant's admissions offered under factor (b).[27] He contends the trial court violated federal due process principles in failing to give this cautionary instruction with respect to evidence of defendant's admissions offered under factor (a).

Preliminarily, defendant's failure to request the desired cautionary instruction forfeited this claim on appeal. (See *People v. Marks* (2003) 31 Cal.4th

---

[27] The trial court instructed the penalty retrial jury with CALJIC No. 2.71, as modified: "An admission is a statement made by the defendant other than at his trial which does not by itself acknowledge his guilt of the crimes alleged under Factor B, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. If you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true. [¶] Evidence of an oral admission by the defendant should be viewed with caution."

197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222]; *People v. Arias, supra,* 13 Cal.4th 92, 170–171.) In any event, the claim lacks merit.

 Defendant acknowledges that this court held in *People v. Livaditis* (1992) 2 Cal.4th 759, 782–784 [9 Cal.Rptr.2d 72, 831 P.2d 297] that, absent a request, the trial court is not required to instruct a penalty phase jury to view a defendant's statements with caution under CALJIC No. 2.71. In *Livaditis, supra,* 2 Cal.4th 759, we observed that, because a defendant's guilt is already established at the penalty phase, "[t]he only relevance of the defendant's extrajudicial statements is as either aggravating or mitigating evidence, not as evidence of guilt." (*Id.* at p. 783.) Thus, whether a defendant would desire the trial court to give the cautionary instruction is unclear because statements offered during a penalty trial are subject to varying interpretations, some mitigating and some aggravating and that therefore a defendant may not desire a cautionary instruction. (*Id.* at pp. 783–784.) Here, because defendant failed to request such an instruction regarding the factor (a) evidence, there was no error in not giving one.

In any event, our examination of the record reveals good reason why defendant would not have requested a cautionary instruction under CALJIC No. 2.71. The penalty phase defense attempted to show that, although defendant was remorseful for the murder, he was unable to express such remorse due to his psychological disorder. The defense offered testimony from defendant's former defense lawyer, Jennifer Keller, describing how he admitted the murder and sobbed with remorse. Clearly, defendant would not want the jury instructed to view with caution evidence of his statements and expressions of remorse concerning the murder that went to a crucial part of his penalty defense. Further, any error in failing to instruct the jury to view defendant's statements with caution was harmless. " 'The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made.' " (*People v. Livaditis, supra,* 2 Cal.4th at p. 784.) In this case, the parties did not dispute that defendant made statements about the crime. Hence, no harm could have resulted from the trial court's failure to provide the cautionary instruction.

### G. *California's Death Penalty Statute*

Defendant argues that various California death penalty provisions violate the federal Constitution. As he acknowledges, we have previously rejected these arguments. Defendant provides no persuasive reason to reconsider our prior decisions. We therefore affirm our prior decisions, as follows.

California's death penalty statute (§ 190.2) adequately performs the constitutionally mandated narrowing function. (*People v. Bennett* (2009) 45 Cal.4th 577, 630 [88 Cal.Rptr.3d 131, 199 P.3d 535]; *People v. Crittenden, supra,* 9 Cal.4th at pp. 154–156.)

The jury's consideration of the circumstances of the crime under factor (a), does not result in arbitrary or capricious imposition of the death penalty. (*People v. Watson, supra,* 43 Cal.4th at p. 703.)

"[T]he Eighth and Fourteenth Amendments to the United States Constitution [do not] require that the jury find unanimously beyond a reasonable doubt the existence of at least one aggravating factor, or that the aggravating factors outweigh the mitigating factors, or that death is the appropriate penalty. (*People v. Ward* (2005) 36 Cal.4th 186, 221 [30 Cal.Rptr.3d 464, 114 P.3d 717].) Neither proof beyond a reasonable doubt nor jury unanimity as to the existence of particular sentencing facts is required. (*Ibid.*) This conclusion is not altered by the United States Supreme Court's decision in *Apprendi v. New Jersey, supra,* 530 U.S. 466, and its progeny. . . . Nor . . . is a preponderance-of-the-evidence burden of proof required at the penalty phase in the event we reject a beyond-a-reasonable-doubt burden of proof." (*People v. Bunyard* (2009) 45 Cal.4th 836, 860–861 [89 Cal.Rptr.3d 264, 200 P.3d 879], citation omitted.)

California's death penalty law is not unconstitutional in failing to require written jury findings regarding the aggravating factors (*People v. San Nicolas, supra,* 34 Cal.4th at p. 676) and failing to require intercase proportionality review. (*Id.* at p. 677.)

The jury may properly consider unadjudicated criminal activity at the penalty phase and need not make a unanimous finding on each instance of such activity. (*People v. Elliot* (2005) 37 Cal.4th 453, 488 [35 Cal.Rptr.3d 759, 122 P.3d 968].) *Apprendi* and its progeny do not demand a different result. (*People v. Bunyard, supra,* 45 Cal.4th at p. 861.)

"The Fifth, Sixth, Eighth, and Fourteenth Amendments are not violated by the use of the adjectives 'extreme' and 'substantial' in connection with section 190.3, factors (g) and (d)." (*People v. Bunyard, supra,* 45 Cal.4th at p. 861.)

The trial court need not label the statutory sentencing factors as either aggravating or mitigating nor instruct the jury that the absence of mitigating factors does not constitute aggravation. (*People v. Watson, supra,* 43 Cal.4th 652, 704.)

Capital defendants are not denied equal protection of the law because California's death penalty scheme does not provide intercase proportionality

review. (*People v. Bunyard, supra,* 45 Cal.4th at p. 861; *People v. Bonilla* (2007) 41 Cal.4th 313, 360 [60 Cal.Rptr.3d 209, 160 P.3d 84].)

We have repeatedly rejected the claim that the death penalty is unconstitutional on the ground that it violates international norms of humanity and decency. (*People v. Panah, supra,* 35 Cal.4th at p. 500.) " 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' " (*Id.* at p. 500.)

## V. CONCLUSION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.