Filed 5/1/26  P. v. Williams CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>CURTIS ELMO WILLIAMS,<br><br>　　Defendant and Appellant. | F088320<br><br>(Super. Ct. No. VCF406132B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Curtis Elmo Williams of first degree murder and found true special allegations related to his use of a firearm in connection with the crime.  The trial court sentenced defendant to 25 years to life in prison plus 25 years to life for defendant's use of a firearm in the commission of the crime.

On appeal, defendant argues that the trial court erred by denying his motion for acquittal, that insufficient evidence supported the jury's verdict, and that his attorney

rendered ineffective assistance of counsel.  The People disagree with each of these arguments but assert that the abstract of judgment entered by the trial court must be corrected.  We affirm.  However, we agree with the People that the abstract of judgment must be corrected to conform to the trial court's oral pronouncement of sentence and order the abstract corrected.

## PROCEDURAL SUMMARY

On April 2, 2024, the Tulare County District Attorney filed a first amended information, charging defendant and codefendant Andrew Michael Hernandez with the murder of Brandon McCarron (Pen. Code,[1] § 187, subd. (a); count 1).  The first amended information further alleged as to defendant that he personally and intentionally discharged a firearm which caused great bodily injury and death of a person (§ 12022.53, subd. (d)), he personally and intentionally discharged a firearm in the commission of the crime (§ 12022.53, subd. (c)), and that he personally used a firearm in the commission of the crime (§§ 12022.53, subd. (b), 12022.5, subd. (a)).  The following circumstances in aggravation were also alleged as to defendant:  the offense involved great violence or great bodily harm (Cal. Rules of Court, rule 4.421(a)(1)),[2] defendant was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)), and that defendant induced others to participate in the commission of the offense(s) and occupied a position of leadership and dominance of other participants in its commission (rule 4.421(a)(4)).

Trial began on April 11, 2024.  Near the close of the prosecution's case-in-chief, on April 16, 2024, counsel for defendant and Hernandez made a motion for acquittal under section 1118.1.  The trial court denied the motion.

On April 23, 2024, the jury returned verdicts finding defendant guilty of murder in the first degree and true the special allegations that, in the commission of the crime,

---

[1]     All further statutory references are to the Penal Code.

[2]     All further rule references are to the California Rules of Court.

defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)), and personally used a firearm (§§ 12022.53, subd. (b), 12022.5, subd. (a)). The jury also found true each of the three aggravating factors. The jury returned no verdict on the allegation that defendant personally discharged a firearm (§ 12022.53, subd. (c)).

On July 2, 2024, the trial court sentenced defendant to 25 years to life on count 1, plus an additional consecutive 25 years to life pursuant to section 12022.53, subdivision (d). The trial court imposed, and stayed pursuant to section 654, the firearm enhancements pursuant to sections 12022.53, subdivision (b) and 12022.5.

Defendant filed a notice of appeal on July 8, 2024.

On July 10, 2024, the court issued an abstract of judgment reflecting that defendant was convicted of one count of first degree murder by a jury and sentenced to 25 years to life. The abstract also states that the jury found true an enhancement pursuant to section 12022.53, subdivision (d) but does not list an associated sentence.

## FACTUAL SUMMARY

**Prosecution Case**

***The Party at Hernandez's Apartment***

On the evening of Friday, November 27, 2020, Hernandez hosted a party at his first-floor apartment located in a complex in Visalia. Attendees included defendant, McCarron, and mutual friends of Hernandez and defendant. Hernandez and McCarron were friends and neighbors in the apartment complex. By the early morning hours of the next day, the other attendees had left the party, leaving Hernandez, defendant, and McCarron as the only ones still engaged in the party.

***Moving the Party to McCarron's Apartment and Scheduling of an Exotic Dancer***

Visalia Police Sergeant Bryan Somavia, the primary investigator assigned to the homicide investigation of McCarron, testified that at approximately 4:00 a.m. on November 28, 2020, security cameras at the apartment complex recorded McCarron and

3.

defendant get out of McCarron's car and walk in the direction of McCarron's apartment. They entered McCarron's apartment a minute later. At approximately 4:15 a.m., Hernandez walked up the stairs to McCarron's apartment. From the time Hernandez entered McCarron's apartment until approximately 5:20 a.m., no one left or entered McCarron's apartment.

McCarron said that he wanted to order an exotic dancer to perform in his apartment. Hernandez replied that because he was loyal to his fiancée he would not stay for the performance, and he went back to his apartment at about 5:20 a.m.

Shortly thereafter, the dancer's driver walked up the stairs to McCarron's apartment to collect the fee for the performance. The dancer arrived at approximately 5:22 a.m. and entered the apartment shortly thereafter. At 5:31 a.m., the driver walked down the stairs from McCarron's apartment towards the parking lot and got into his car.

The dancer testified that upon arriving in the apartment she saw two men, who she identified as the person who booked her performance and a "black guy." During the police investigation, the dancer identified defendant as the "black guy" she saw in the apartment. Soon after arriving, she went into the bathroom to change her clothing.

### The Shooting and Its Aftermath

When the dancer came out of the bathroom to begin her performance, defendant said to her: "[i]f [she] wasn't going to fuck" "[t]hen he want[ed] his money back." She testified that defendant's demeanor was different than when she arrived, and that he was "rude" to her. She declined his request and said she would refund the money. McCarron said that it was fine for her to just dance. Believing that she would not be performing, the dancer called her driver to come back to the apartment to refund the money.

As McCarron and defendant argued with raised voices about whether the dancer would be allowed to perform, Hernandez "burst [through] the door." Surveillance video recording of Hernandez going to McCarron's apartment just before this moment showed

4.

him walking towards the stairs with his right hand in the area of his waist and taking some of the stairs two at a time.

When he entered the apartment, Hernandez had the gun "in his pants." Defendant approached Hernandez and asked "where [is my] gun or the gun." Hernandez then handed the gun to defendant.

Once he had the gun in his hand, defendant hit McCarron with it. It did not appear to the dancer that McCarron was fighting back. Seeing this, the dancer went into the kitchen.

While there, she heard a single gunshot, which caused her to flee the apartment. As she left, she saw McCarron fall to the couch on his back. Surveillance footage confirmed that Hernandez exited the apartment and went down the stairs with the dancer following soon thereafter at approximately 5:35 am. Video footage showed defendant come down the stairs and run in the direction of Hernandez's apartment seconds after the dancer left.

### Hernandez's Accounts of the Party and the Shooting in Interviews with Police

The prosecution introduced a redacted video recording of an in-person interview the police conducted with Hernandez on December 2, 2020. In his initial statement to police, Hernandez's version of the events up until he left McCarron's apartment before the dancer arrived was largely consistent with the evidence presented by the prosecution. However, he claimed that he went to sleep after finishing a glass of whiskey and smoking a cigarette. After waking up the next morning, Hernandez said that he went to his sister's house for breakfast.

Somavia told Hernandez that there was a camera pointed in the direction of McCarron's apartment, and what Hernandez said occurred before the dancer arrived was not accurate. Hernandez then acknowledged being in McCarron's apartment, saw the dancer there, but said that he then left. Hernandez denied killing his neighbor and said

5.

that McCarron was a close friend of his. Hernandez said that he could be killed for talking.

When pressed further about what happened, Hernandez said:

> "I heard fighting from downstairs when I was out there drinking and smoking. I heard fighting so I ran up there. I just, you know, I ran in. I saw the stripper, she looked scared and then when I saw fighting, I heard a gunshot and I just took off running. And then right up behind me, I think, that's when the [dancer] came out running and then that's it."

Later in the interview, Hernandez said that he heard an argument upstairs and he heard yelling. He went upstairs to see what was going on and when he got there, he saw fighting and then he heard a gunshot which caused him to "g[e]t the fuck out of there and [he] ran inside."

When asked about going back to McCarron's apartment at approximately 6:08 a.m. with a female, Hernandez acknowledged that he and a female friend who had attended the party went up to the apartment. He said that he went there to check on McCarron. When asked why he did not call 911, Hernandez said that he was scared.

McCarron's body was discovered by law enforcement on Monday, November 30, 2020, and an investigation began to determine his cause of death. An identification technician testified that based on the amount and location of gun residue found on McCarron's clothing, the barrel of the gun was "very close" to McCarron's chest when it was fired.

**Defense Case**

*Defendant's Testimony*

Defendant attended the party with his long-time girlfriend[3] and his son. Defendant testified that he brought a nine-millimeter handgun to the party for his own protection. When he arrived at the party, he asked Hernandez to put it away for him.

---

**3**      Defendant referred to her as his "wife," though they were not legally married.

Defendant's testimony regarding the party at Hernandez's apartment was consistent with the evidence presented by the prosecution. He said that he did not know McCarron and that this was the first time he met him. Defendant testified that he, Hernandez, and McCarron continued the party at Hernandez's apartment for a while and then went up to McCarron's apartment later.

While at McCarron's apartment, defendant and McCarron left the apartment to try to procure additional drugs. After they returned, they continued drinking and doing drugs. Sometime thereafter, McCarron decided to order a dancer. Defendant testified that he did not want to order a dancer but eventually agreed to do so.

When the dancer and her bodyguard arrived, the dancer went into the bathroom to change and defendant and the bodyguard discussed the price for the dancer's performance. Defendant paid the bodyguard $200 while the dancer was in the bathroom. Defendant testified that once the dancer came out, defendant changed his mind and said he wanted to leave. However, defendant also testified that when the dancer emerged from the bathroom, he asked her to have sex with him. When she declined, he asked for his money back and she agreed to return the money. When McCarron saw that the dancer was going to leave, he got mad.

Defendant denied being angry that the dancer would not have sex with him or being angry that McCarron wanted her to just dance for them. When asked why he did not want to allow her to dance, defendant said, "I really didn't even want it, want a dancer. I really didn't even want to go along with that. But I did it because I was getting forced into it, and I wanted to stay, obviously."

Defendant testified that as the dancer was gathering her things to leave, Hernandez entered the apartment and defendant asked Hernandez for his gun so defendant could leave. Hernandez then handed defendant his gun. As defendant was trying to put the gun away, McCarron hit him. Defendant testified, "Well, after I got struck, I tried to build

myself back up to block myself, but [McCarron] was just—he just kept swinging on me. And that's when the firearm discharged. And that still—that still didn't stop him."

Defendant testified that, after the gun fired, McCarron "snatched [jewelry] off [defendant's] neck" and hit him more than five additional times. They continued to fight for more than 10 seconds after McCarron had been shot. Defendant testified that the gun fell out of his hand at some point during the fight. He found it and then left the apartment. When he left McCarron's apartment, McCarron was still breathing. Defendant testified that prior to McCarron attacking him, defendant did not argue with McCarron. He did not call for help when he left McCarron's apartment because he was scared.

After leaving McCarron's apartment, he asked Hernandez to give him a ride home, which he did. Also, at some point after leaving McCarron's apartment, defendant disposed of the gun in a "[t]rash can somewhere." Sometime after arriving home, he went to his mother's house in Sacramento to avoid law enforcement.

### Codefendant Hernandez's Testimony

Hernandez's testimony regarding the party at his apartment largely corroborated the evidence introduced up to that point. He added that he met McCarron at the apartment complex about a year and a half before the shooting and considered McCarron a good friend with whom he socialized often. On the other hand, Hernandez testified that he did not know defendant well.

Regarding the gun defendant brought to the party, Hernandez testified that he was not comfortable with it being inside of his apartment and when defendant gave it to him, Hernandez put it on the top shelf of his closet.

Hernandez said that after the other attendees left his apartment, "at some point," thereafter the three went to McCarron's apartment. Later still, McCarron and defendant decided to leave on their own and Hernandez went back to his apartment.

When McCarron and defendant returned to the apartment complex, McCarron sent Hernandez a text message and asked whether he wanted to come back over and hang out; Hernandez agreed to do so. When Hernandez arrived at McCarron's apartment, McCarron and defendant were drinking and Hernandez joined them. When McCarron said that he wanted to hire a dancer to perform for them, Hernandez said that he did not want to be involved and left.

Hernandez denied that he heard an argument between defendant and McCarron and testified that the reason he went back to McCarron's apartment was in response to a text message from defendant requesting that his gun be brought to him, though a subsequent search of Hernandez's cellular telephone and telephone records showed no evidence of such a text message. Hernandez said he lied to police in his interview about hearing defendant and McCarron arguing because he did not know what defendant was capable of and did not want to be blamed for a murder that he did not commit. When asked on cross-examination how defendant knew his cellular telephone number to text him, Hernandez testified that "when we were at my apartment, we all exchanged phone numbers."

Hernandez testified that, in response to defendant's request that he bring defendant's gun to him, he went to his closet, retrieved the gun, and took it with him to McCarron's apartment. Hernandez admitted that in walking up to McCarron's apartment he was "moving kind of quick" but denied that he had any reason to be in a hurry and in taking the gun to defendant he was "[s]imply returning … property to [defendant]." Hernandez confirmed that when he was walking up the stairs, he was holding the gun in his waistband. Hernandez testified that when he arrived, defendant and McCarron were not fighting. When defendant asked him where the gun was, Hernandez said that he took the gun out of his waistband and handed it to defendant.

Hernandez said that McCarron then asked defendant what he was going to do with the gun and defendant said "nothing. [He] just want[ed] [his] money back. [¶] And at

9.

that point, [McCarron] struck [defendant] and [defendant] kind of stumbled a little bit, and that's when [Hernandez] heard the gunshot." On cross-examination, Hernandez further described this moment as follows: "So when he stumbled back, he put one foot behind him. I just know that he was at an angle. And after he stumbled back, his hand comes up and the gun goes off." Hernandez confirmed that he saw defendant strike McCarron with the gun but thought that happened after the gun fired.

After the shooting, Hernandez left the apartment. Defendant met Hernandez in his apartment downstairs, and Hernandez agreed to give him a ride home. After dropping defendant off at home, Hernandez returned to McCarron's apartment with friends and confirmed that McCarron had been shot in the chest.

After leaving McCarron's apartment, Hernandez realized that he did not have his cellular telephone. The friends who went with him to McCarron's apartment told Hernandez that defendant had Hernandez's telephone. These friends told Hernandez to drive to a nearby gas station where they and Hernandez met defendant and his girlfriend. Once he got his telephone back, the group "discussed what had happened" and "decided what to do next."

Hernandez claimed that the friends who had attended the party told him that defendant had his telephone, told Hernandez "to just stay quiet and act like nothing happened," and to "leave town and lay low." On cross-examination, Hernandez said that defendant also asked him to "stay quiet," but did not threaten him. Someone in the group came up with a plan for defendant to leave town as well.

After initially leaving town, Hernandez testified that he realized that doing so made him look guilty, so he came back, and eventually turned himself in on December 2, 2020.

**Prosecution's Rebuttal Evidence**

In rebuttal, Somavia testified that as part of the investigation the police obtained copies of the contents of Hernandez's cellphone and his cellphone records. The police

found that Hernandez had a contact for defendant in his cellphone that was created on November 24, 2020, under the name "Mozzy," which Hernandez told police during an interview was a name that defendant used.

Somavia testified that prior to his in-person interview with Hernandez, he listened to a recorded telephone call between another police officer and Hernandez, a copy of which was received into evidence during Somavia's testimony. During that call, Hernandez provided an account of the evening of the shooting. Hernandez said he left McCarron's apartment to go home to go to sleep (omitting mention of the dancer) and the next thing he knew, he was woken up by defendant who was "frantic" and asked for a ride home. On the way, defendant said " 'I took care of [McCarron]. Keep your fucking mouth shut.' " Hernandez said that he heard what happened to McCarron a few days later.

The prosecution then offered, and the trial court admitted into evidence, an unredacted version of Hernandez's December 2, 2020 interview with police. In the unredacted version, references Hernandez made to defendant were included. Notable statements that were omitted in the redacted version, included claims by Hernandez that:

1. Defendant had threatened him after the shooting when he was giving him a ride home, by saying variations of "I took care of [McCarron]. Keep your fucking mouth shut." Hernandez said he was "scared" by these statements.

2. Hernandez made statements that defendant would harm him if he talked to police, and that there might be people watching his apartment. Hernandez said if defendant found out that he talked, "it's done for me too. I'll end up just like [McCarron]," and "I don't want to end up dead."

3. In response to a question about whether defendant was in a gang, Hernandez said that "[t]here's a bunch of rappers on YouTube who call themselves Mozzia. I presume it's a gang."

11.

## DISCUSSION

Defendant challenges the judgment of conviction on two principal grounds. First, he argues that insufficient evidence was introduced to support the finding that he murdered McCarron with deliberation and premeditation. In connection with this basis for appeal, he argues that the trial court erred by denying his motion for acquittal under section 1118.1.

Second, he argues that the admission of the unredacted interrogation violated Evidence Code sections 350, 352, and 1200, and his federal constitutional due process rights because it contained inadmissible hearsay and irrelevant, speculative, unduly inflammatory, and unnecessarily repetitive statements implicating him in the crime, which were prejudicial. In connection with this ground for appeal, he argues that his trial counsel was ineffective for failing to object or to request a cautionary instruction.

## I. Sufficiency of the Evidence

### A. Standard of Review

In assessing a challenge to the sufficiency of the evidence to support a criminal conviction, " 'the reviewing court's role is a limited one.' " (*People v. Alvarez* (2025) 18 Cal.5th 387, 470.) The test is whether, viewing the entire record in the light most favorable to the judgment, it contains substantial evidence from which a rational finder of fact could make the necessary findings beyond a reasonable doubt. (*Ibid.*) The evidence must be "reasonable, credible, and of solid value." (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396, overruled on other grounds in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901.) Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

12.

The reviewing court does not reweigh the evidence or reconsider witness credibility determinations previously made by the trier of fact. (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) It is the jury, not the reviewing court that must be convinced of the defendant's guilt. (*People v. Jones* (2013) 57 Cal.4th 899, 961.) A reviewing court cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) " ' "Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact]." ' " (*People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

When an appellate court reviews the denial of a motion for acquittal made at the close of the prosecution's case-in-chief, the reviewing court " 'us[es] the same standard "employed in reviewing the sufficiency of the evidence to support a conviction." ' " (*People v. Barrett* (2025) 17 Cal.5th 897, 964.) Because the motion is made and ruled upon prior to the admission of all evidence in the case, the sufficiency of the evidence is tested at the time the motion is made. (*People v. Lamb* (2024) 16 Cal.5th 400, 442.) The trial court's ruling is subject to independent review. (*Ibid*.)

### B. The Law of First Degree Premeditated and Deliberate Murder

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) Murder committed willfully with deliberation and premeditation is first degree murder. (§ 189, subd. (a).) " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.... "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.... "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection.

13.

Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

### C. Analysis

Like this case, the defendant in *Barrett* was convicted of first degree murder and claimed that the evidence was insufficient to show that the murder was deliberate and premeditated. The Supreme Court addressed the kind of evidence that can support findings of deliberation and premeditation, as follows:

> " ' " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citation.]' [Citation.] In *People v. Anderson* (1968) 70 Cal.2d 15, 26, … we identified 'three basic categories' of evidence that may be probative of premeditation and deliberation: 1) planning activity, 2) motive, and 3) manner of killing. However, ' "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate." [Citation.] "The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." ' " (*People v. Barrett*, *supra*, 17 Cal.5th at p. 965.)

The Supreme Court rejected the defendant's claim that the prosecution failed to present substantial evidence in its case-in-chief of planning activity, motive, and manner of killing from which the jury could have reasonably found that the defendant killed the victim with deliberation and premeditation. (*People v. Barrett*, *supra*, 17 Cal.5th at p. 965.) Rather, the Supreme Court explained that the People introduced evidence that the murder weapon was cut from a desk that the defendant shared with the victim, that making such a weapon would take time, and that the weapon was the only one found in the defendant's cell after the murder. (*Ibid*.) The Court found that the manner of death—stabbing—was consistent with deliberation and premeditation because while the victim suffered 12 stab wounds, the defendant had none and no defensive wounds, and the cell was in an orderly state following the killing, which suggested that the defendant killed

14.

the victim in a surprise attack. (*Id*. at p. 966.) The fact that the prosecution may not have proved motive was no obstacle for the court finding that they had met their burden to overcome a motion for acquittal because "motive 'evidence is not indispensable to proving premeditation when the manner of killing evidence is so compelling.' " (*Ibid*.)

### 1. The trial court correctly denied defendant's motion for acquittal.

In this case, at the close of the prosecutor's case-in-chief, viewing the evidence in the light most favorable to the prosecution, the evidence established the following facts. Defendant attended the party at Hernandez's apartment with Hernandez, McCarron, and others. By the early hours of the following day, the other attendees had left, leaving only Hernandez, McCarron, and defendant still engaged in the party. Defendant and McCarron entered McCarron's apartment at approximately 4:01 a.m. Hernandez entered McCarron's apartment at approximately 4:15 a.m., and no one went in or out of McCarron's apartment between 4:15 a.m. and 5:20 a.m. At 5:20 a.m., Hernandez left McCarron's apartment and walked towards his own apartment. At 5:22 a.m. the dancer and her driver walked up the stairs together to McCarron's apartment. At 5:31 a.m., the driver left McCarron's apartment.

After the dancer changed her clothes in the bathroom for her performance and declined defendant's request to have sex with him, defendant and McCarron argued over whether to allow her to dance or to demand a refund of her fee. Hernandez heard defendant and McCarron arguing, armed himself with defendant's firearm, ran to McCarron's apartment to see what was going on, and "burst [through McCarron's] door."

When Hernandez entered the apartment, he saw that the dancer looked scared and he saw fighting between defendant and McCarron. Defendant asked Hernandez for the gun, which Hernandez removed from his pants and handed to defendant. Defendant then used the gun to hit McCarron who did not appear to fight back.

Soon thereafter, a single gunshot was fired into McCarron's chest. After hearing the gun shot, Hernandez left the apartment and walked towards his apartment. The

15.

dancer followed soon thereafter and was followed seconds later by defendant. At defendant's request, Hernandez gave him a ride home.

From these facts the jury could find that when he asked Hernandez for the gun, defendant intended to use it in his fight with McCarron, which he did, first by hitting McCarron with it, and then shooting McCarron once in the chest.

These facts, when viewed in the light most favorable to the prosecution, establish the existence of all three of the *Anderson* criteria. The evidence established that defendant planned to use the gun to kill McCarron because he asked for it and used it immediately thereafter to strike McCarron and then fired it at McCarron's chest at close range, killing him.[4] Defendant's motive was his argument with McCarron over what to do with the dancer and his desire to prevail in the fight they were engaged in. In addition, a rational finder of fact could infer that the manner of killing, a single gunshot fired at close range into McCarron's chest evidenced defendant's intent to kill.

From this evidence, a jury could have found beyond a reasonable doubt that defendant deliberated on whether to kill McCarron in the moment before he asked for his gun and in the moment after he received it and decided to kill McCarron *instead of* leaving the apartment as he earlier said was his desire. The jury could also have found that defendant acted with premeditation because defendant thought over whether to kill McCarron or leave the apartment.

The evidence was thus sufficient to establish deliberation and premeditation, and the trial court correctly denied defendant's motion for acquittal.

---

[4]  As noted by the People in their brief, a long line of case law in California supports the inference that drawing a gun is generally evidence of one's intent to use it. (*People v. McMakin* (1857) 8 Cal. 547, 549 (*McMakin*) ["The drawing of a weapon is generally evidence of an intention to use it."]; *People v. McCoy* (1944) 25 Cal.2d 177, 193 [quoting *McMakin*]; *People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 208 [quoting *McMakin*].)

### 2. The evidence was sufficient to establish that defendant murdered McCarron upon deliberation and premeditation.

The additional evidence adduced during the defense case and the People's rebuttal, viewed in the light most favorable to the judgment, supports the findings of deliberation and premeditation made by the jury.

In particular, the jury could have found that the reason Hernandez went to McCarron's apartment prior to the shooting was because defendant sent him a text message asking for his gun. That evidence supported a finding that defendant planned to shoot McCarron; defendant knew that Hernandez had his gun and he needed Hernandez to provide it to him in order to use it against McCarron. The jury could reasonably have deduced that the defendant's shooting of McCarron was not spur of the moment, but the result of defendant's thoughts—defendant's desire for his gun which Hernandez possessed and decision to request that the gun be brought to him—and actions—sending a text message to Hernandez to bring him the gun, arming himself with the gun, hitting McCarron with it, and then shooting McCarron in the chest at close range.

This evidence, together with the evidence introduced as part of the prosecution's case-in-chief, was sufficient for the jury to conclude beyond a reasonable doubt that defendant murdered McCarron upon deliberation and premeditation. That some of the evidence presented could have been reconciled with a contrary verdict does not undermine our conclusion that the evidence was sufficient to support the jury's premeditation and deliberation findings. (*People v. Westerfield*, *supra*, 6 Cal.5th at p. 713.)

## II. Defendant Forfeited His Objections to the Admission of the Unredacted Interview of Codefendant Hernandez and His Claim of Ineffective Assistance of Counsel Fails

An unredacted version of Hernandez's interview with police was admitted into evidence at trial. On appeal, defendant contends the trial court erred in admitting the

unredacted interview, but he failed to object to the admission of the unredacted interview at trial.

By failing to object to the purportedly erroneous admission at trial, defendant forfeited his right to raise the argument on appeal. (*People v. Stevens* (2015) 62 Cal.4th 325, 333; 11 Witkin, Cal. Evidence Presentation (11 Witkin, Cal. Evidence Presentation (6th ed. 2025) Failure to Object., § 395 ["Obviously, failure to object at all waives the defect."].) Presumably aware that he forfeited the argument, defendant argues in the alternative that he received ineffective assistance of counsel in violation of his rights under the federal and state constitutions. (U.S. Const., Amend. VI; Cal. Const., art. I, § 15.)

A defendant asserting a claim of ineffective assistance of counsel has the burden of showing both that (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudice, that is, but for counsel's unprofessional error a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687−688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.) It is not necessary to determine whether counsel's challenged action was professionally unreasonable in every case, however. If the reviewing court can resolve the ineffective-assistance claim by proceeding directly to the issue of prejudice—i.e., the issue of whether there is a reasonable probability that the outcome would have been different absent counsel's challenged actions or omissions—it may do so. (*Strickland v. Washington*, *supra*, at p. 697.)

As our Supreme Court has explained,

> "reviewing court[s] will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.… If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide

18.

one, or there simply could be no satisfactory explanation." (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

The purportedly erroneously admitted statements made by Hernandez during his interview with police were as follows: (1) defendant admitted to Hernandez that he "took care" of McCarron, (2) defendant threatened Hernandez to keep him from talking to police, and (3) a statement suggesting defendant was a gang member. Even if these statements were inadmissible hearsay, speculative, unduly inflammatory, or unnecessarily repetitive, defendant has not demonstrated that their admission was prejudicial.

The questions before the jury were whether defendant killed McCarron with malice aforethought and, if so, whether he did so upon deliberation and premeditation. By the time the jury heard that defendant allegedly told Hernandez that he "took care" of McCarron and that defendant allegedly threatened Hernandez to not talk about the incident, they had already received ample evidence from which they could resolve the question of defendant's guilt. To wit, the jury heard that, during a loud fight between defendant and McCarron, defendant sent a message to Hernandez to bring him his gun (or Hernandez brought the gun on his own), defendant requested the gun from Hernandez, and upon receiving that gun, defendant hit McCarron with it, shot him in the chest at close range, fled the scene with Hernandez, and then went on the run for months to avoid the police. Whether defendant stated that he "took care" of McCarron did not affect the outcome. Moreover, the language Hernandez testified at trial that defendant used—that Hernandez should "stay quiet," "stay stitch-lipped," and "don't say shit"—is not challenged on appeal and largely mirrors what Hernandez told Somavia in the interview—that Hernandez should "keep [his] fucking mouth shut." The only meaningful difference between Hernandez's testimony at trial and his statement during his police interview was the characterization of defendant's statements as "threats" and Hernandez's expression of fear in the interview that something might happen to him if he

talked to police. That evidence was largely cumulative of the other evidence and did not affect the outcome.

Next, the statement about defendant's alleged gang affiliation—"[t]here's a bunch of rappers on YouTube who call themselves Mozzia. I presume it's a gang"—was vague and only questionably inculpatory. Further, that evidence was also largely cumulative— the dancer testified that defendant referred to himself as having been from "a gang" or "Hellgang Mozzy." No objection was raised at trial or on appeal to admission of that evidence. Hernandez's initial response in the unredacted interview to the question of defendant's gang membership—"I don't know"—and then his follow-up—"There's a bunch of rappers … who call themselves Mozzia. I presume it's a gang"—did not affect the outcome of the case. Moreover, while the record is silent regarding why defendant's attorney did not object, he may have chosen to refrain from doing so to avoid drawing attention to Hernandez's claim or, as the People suggest, because defense counsel believed that the jury would view Hernandez's uncorroborated claim as additional evidence of his unreliability, further discrediting him as a witness against defendant. Whatever the case may be, as the record on this point is silent, and there are satisfactory tactical reasons for defense counsel not to object, we must reject defendant's claim of ineffective assistance of counsel regarding the failure to object to the gang evidence.[5] (*People v. Gamache*, *supra*, 48 Cal.4th at p. 391.)

These allegedly inadmissible statements offered little evidentiary value to further implicate defendant and subjected defendant to little or no risk of unfair prejudice; we

---

[5]     We recognize that there are cases in which the improper admission of gang evidence can be so prejudicial as to warrant reversal of a jury verdict. (See, e.g., *People v. Albarran* (2007) 149 Cal.App.4th 214.) However, for the reasons explained above, and where, as here, the evidence supporting the verdict is substantial, we cannot find that but for the alleged erroneous admission of statements regarding defendant's possible gang affiliation a different result was reasonably probable.

cannot say that the admission of these statements affected the outcome of this case. This record does not support defendant's ineffective assistance of counsel claim.

### III. The Abstract of Judgment Must Be Corrected to Reflect the 25 Years to Life Enhancement Imposed by the Trial Court

As identified by the People in their brief, the abstract of judgment entered by the trial court does not include the 25 years to life sentence imposed for the firearm enhancement.

"When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties." (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

To correct the error described above, we direct the trial court to issue an amended abstract of judgment to reflect the sentence of 25 years to life for the firearm enhancement imposed under section 12022.53, subdivision (d).

### DISPOSITION

The judgment is affirmed. The trial court is directed to modify the abstract of judgment to reflect the sentence of 25 years to life for the firearm enhancement imposed under section 12022.53, subdivision (d), and forward the corrected abstract of judgment to the relevant entities.

DESANTOS, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.